FILED
United States Court of Appeals
Tenth Circuit

July 19, 2010

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

# UNITED STATES COURT OF APPEALS

# TENTH CIRCUIT

---

THOMAS MINK,

      Plaintiff-Appellant,

v.

SUSAN KNOX, a Deputy District
Attorney working for the 19th Judicial
District Attorney's Office, in her
individual capacity,

      Defendant-Appellee.

No. 08-1250

---

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:04-CV-00023-LTB)**

---

Marcy G. Glenn of Holland & Hart LLP, Denver, Colorado (A. Bruce Jones of
Holland & Hart LLP, Denver, Colorado; and Mark Silverstein of American Civil
Liberties Union Foundation of Colorado, Denver, Colorado, with her on the
briefs), for Plaintiff-Appellant.

Andrew D. Ringel (David R. Brougham with him on the brief) of Hall & Evans,
L.L.C., Denver, Colorado, for Defendant-Appellee.

---

Before **O'BRIEN**, **SEYMOUR** and **GORSUCH**, Circuit Judges.

---

**SEYMOUR**, Circuit Judge.

Thomas Mink appeals the district court's dismissal of his 42 U.S.C. § 1983 complaint against Susan Knox, a deputy district attorney, on qualified immunity grounds. We reverse.

## I.

Mr. Mink, a student at the University of Northern Colorado ("UNC"), created a fictional character, "Junius Puke," for the editorial column of his internet-based journal, *The Howling Pig*.[1] *Mink v. Suthers*, 482 F.3d 1244, 1249 (10th Cir. 2007), *cert. denied*, 128 S. Ct. 1122 (2008) ("*Mink I*"). The editorial column displayed altered photographs of Junius Peake, a UNC professor, wearing dark sunglasses and a Hitler-like mustache. *Id.* at 1249. Junius Puke's editorial column addressed subjects on which Mr. Peake would be unlikely to write, in language he would be unlikely to use, asserting views that were diametrically opposed to Mr. Peake's. *See id.*

Mr. Peake, who was not amused, contacted the Greeley police, who started investigating a potential violation of Colorado's criminal libel statute, COLO. REV. STAT. § 18-13-105. *See Mink v. Knox*, 566 F. Supp. 2d 1217, 1220 (D. Colo. 2008) ("*Mink II*"). In conformance with Colorado Revised Statute § 20-1-106.1,

---

[1] The facts are taken primarily from our previous decision in *Mink v. Suthers*, 482 F.3d 1244, 1249-1251 (10th Cir. 2007), *cert. denied*, 128 S. Ct. 1122 (2008) ("*Mink I*"), and the district court's decision on remand in *Mink v. Knox*, 566 F. Supp. 2d 1217, 1220 (D. Colo. 2008) ("*Mink II*"). We also quote from the amended complaint.

the detective in charge prepared a search warrant affidavit to submit to the office of the district attorney for legal review. The deputy district attorney, Susan Knox, reviewed and approved the search warrant affidavit, which was identical to the warrant with respect to the eleven paragraphs listing the items to be seized. The search warrant and affidavit were both attached to Mr. Mink's amended complaint, and are attached to this opinion as Exhibits A and B.[2] The affidavit and warrant were presented to and approved by a magistrate judge. The Greeley police then searched the home where Mr. Mink lived with his mother and confiscated their personal computer, as well as written materials referencing *The Howling Pig*. *See Mink I*, 482 F.3d at 1249.

Mr. Mink and his mother subsequently filed suit in federal district court against the City of Greeley, Colorado, the district attorney, Detective Ken Warren, and a "John Doe" assistant district attorney, seeking damages for the search and seizure, among other things. The district court granted Mr. Mink's motion for a temporary restraining order and ordered the City of Greeley to return "to the Plaintiffs the computer, and all contents thereof, seized following the search of Plaintiffs' home." *Id.* at 1250 (quoting Dist. Ct. Order, Jan. 9, 2004, at 1). Thereafter, the district attorney issued a written "No File" decision, concluding that the statements contained in *The Howling Pig* could not be prosecuted under the Colorado criminal libel statute.

---

[2] Ms. Knox admitted in an affidavit submitted on March 8, 2004, that she reviewed the warrant as well as the search warrant affidavit.

Mr. Mink then amended his complaint, removing his mother as a plaintiff and adding Ms. Knox as a defendant.[3] The district court granted Ms. Knox's motion to dismiss the suit in its entirety, holding in part that Mr. Mink's constitutional claims against Ms. Knox were barred by absolute immunity. We reversed, determining that

> a prosecutor is entitled to absolute immunity for those actions that cast him in the role of an advocate initiating and presenting the government's case. Absolute immunity, however, does not extend to those actions that are investigative or administrative in nature, including the provision of legal advice outside the setting of a prosecution.

*Id*. at 1261-62. We concluded that Ms. Knox "was not wearing the hat of an advocate," *id.* at 1262, when she reviewed the affidavit in support of the warrant, and "thus, is not entitled to absolute prosecutorial immunity." *Id*. at 1263. Nevertheless, we noted that Ms. Knox "may be entitled to qualified immunity if she reasonably concluded probable cause existed to support the warrant application, or that the application of the Supreme Court's First Amendment cases to the criminal libel statute was not clearly established under the circumstances here." *Id*.

On remand the district court granted Ms. Knox's motion to dismiss the amended complaint, holding that (1) "a reasonable official in Knox's position could believe that the statements in *The Howling Pig* were not protected

---

[3] Mr. Mink also removed the City of Greeley and Officer Warren, and added Ken Salazar in his official capacity as Attorney General of Colorado.

statements under the First Amendment - and, accordingly, that Plaintiff's actions in publishing such statements could subject him to criminal prosecution under the Colorado libel statute," and (2) although the search warrant violated the Fourth Amendment's particularity requirement, it was not clearly established that Ms. Knox's authorization of the search warrant affidavit lacking particularity violated the Fourth Amendment. *Mink II*, 566 F. Supp. 2d 1217, 1223-24, 1228-29. The district court concluded that Ms. Knox was entitled to qualified immunity.

On appeal, Mr. Mink asks us to decide whether the district court erred when it dismissed,

> on the basis of qualified immunity, Mr. Mink's claim alleging an unlawful search and seizure in violation of the Fourth Amendment, where the search lacked probable cause because clearly-established First Amendment law protected Mr. Mink's speech, and because the overbroad affidavit and warrant violated clearly-established Fourth Amendment law[.]

Aplt. Br. at 2.

**II.**

"[F]ederal courts engage in de novo review when mulling defamation issues that are tinged with constitutional implications." *Levinsky's, Inc. v. Wal-Mart Stores, Inc.*, 127 F.3d 122, 127 (1st Cir. 1997). "This requirement of independent appellate review is not a procedural directive, but, rather, 'a rule of federal constitutional law' that 'reflects a deeply held conviction that judges . . . must exercise such review in order to preserve the precious liberties established and

-5-

ordained by the Constitution.'" *Id.* (quoting *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 510-11 (1984)).

To determine whether a motion to dismiss was properly granted, we apply a plausibility standard to ascertain whether the complaint includes enough facts that, if assumed to be true, state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). *See also Corder v. Lewis Palmer Sch. Dist. No. 38*, 566 F.3d 1219, 1223-1224 (10th Cir. 2009). We accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the nonmoving party, here the plaintiff. *See Archuleta v. Wagner*, 523 F.3d 1278, 1283 (10th Cir. 2008); *Anderson v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 521 F.3d 1278, 1284 (10th Cir. 2008).

We also review *de novo* the district court's decision regarding qualified immunity. *Archuleta*, 523 F.3d at 1282. "[G]overnment officials performing discretionary functions generally are granted a qualified immunity and are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id*. at 1282-83 (quoting *Wilson v. Layne*, 526 U.S. 603, 609 (1999)). "Once the qualified immunity defense is asserted, . . . the plaintiff must demonstrate that the defendant's actions violated a constitutional or statutory

right" and that "the constitutional or statutory rights the defendant allegedly violated were clearly established at the time of the conduct at issue."[4]  *Id*.  In determining whether a constitutional right was clearly established, we look at the specific context of the case.  *Bowling v. Rector*, 584 F.3d 956, 964 (10th Cir. 2009).

> A plaintiff can demonstrate that a constitutional right is clearly established by reference to cases from the Supreme Court, the Tenth Circuit, or the weight of authority from other circuits.  There need not be precise factual correspondence between earlier cases and the case at hand, because general statements of the law are not inherently incapable of giving fair and clear warning.  The right must only be sufficiently clear that a reasonable official would understand that what he is doing violates that right.

*Archuleta,* 523 F.3d at 1283 (internal citations, quotation marks, and alterations omitted).

In dismissing Mr. Mink's amended complaint, the district court considered whether: (1) there was a causal connection between Ms. Knox's actions and the alleged violation of Mr. Mink's constitutional rights; (2) Mr. Mink's constitutional rights were violated; and (3) the violated constitutional rights were clearly established at the time the violation occurred.  We address each of these questions in turn.

---

[4] We may consider the two parts of this test in the sequence we deem best in light of the circumstances in the particular case.  *See Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009).

## A.
## The Causal Connection

Mr. Mink alleged that Ms. Knox caused the issuance of a search warrant that lacked probable cause and particularity, thereby causing a violation of his Fourth Amendment rights. The district court held that in order to recover on this claim, Mr. Mink was required to allege Ms. Knox's direct participation in the constitutional violation, and that he had failed to do so:

> Plaintiff does not, however, allege that Knox issued the warrant, nor that she reviewed the warrant, nor that she participated in the search and seizure executed pursuant to the warrant. The question here, therefore, is whether - taken in the light most favorable to Plaintiff - the complaint alleges sufficient facts to show Knox - solely by reviewing and approving the affidavit submitted in support of the search warrant - violated Plaintiff's constitutional rights.

*Mink II*, 566 F. Supp. at 1229. In so construing the amended complaint, the district court erred.

> Title 42 U.S.C. § 1983 provides, in relevant part:
>
> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or *causes* to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

*Id.* (emphasis added). "The requisite causal connection is satisfied if the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights." *Snell v. Tunnell*, 920 F.2d 673, 700 (10th Cir. 1990).

Thus, "[f]or liability under Section 1983, direct participation is not necessary." *Id.* (quotation omitted); *see also Buck v. City of Albuquerque*, 549 F.3d 1269, 1279-80 (10th Cir. 2008). "Any official who 'causes' a citizen to be deprived of her constitutional rights can also be held liable." *Snell*, 920 F.2d at 700 (quotation omitted). The plaintiff may demonstrate causation by showing an affirmative link between the constitutional deprivation and the officer's exercise of control or direction. *See Poolaw v. Marcantel*, 565 F.3d 721, 732 (10th Cir. 2009) (presence during search held unnecessary for § 1983 liability for unconstitutional search where one defendant officer authorized search and second defendant officer drafted affidavit for search warrant);[5] *Wulf v. City of Wichita*,

---

[5] In *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009), the Supreme Court held in a *Bivens* action alleging unconstitutional discrimination that "each Government official . . . is only liable for his or her own misconduct." *Id.* at 1949. The Court's dissenters viewed this pronouncement as "eliminating . . . supervisory liability entirely." *Id.* at 1957 (Souter, J., dissenting). We noted both views in *Lewis v. Tripp*, as well as the fact that they have "generated significant debate about the continuing vitality and scope of supervisory liability, not only in *Bivens* actions, but also in § 1983 suits." 604 F.3d 1221, 1227 n.3 (10th Cir. 2010) (citing *al-Kidd v. Ashcroft*, 580 F.3d 949, 976 n.25 (9th Cir. 2009), and Sheldon Namod, *Constitutional Torts, Over-Deterrence and Supervisory Liability after Iqbal*, 14 LEWIS & CLARK L. REV. 279, 294-98 (2010)). *See also T.E. v. Grindle*, 599 F.3d 583, 588-89 (7th Cir. 2010) (holding plaintiffs' claims withstand *Iqbal* where there is evidence that the supervisor "knew about [her subordinate's] abuse of the girls and deliberately helped cover it up," permitting a jury to reasonably infer "that [the supervisor] also had a purpose of discriminating against the girls based on their gender") (citation omitted).

We found it unnecessary in *Lewis* to take a position on the debate, and we need not do so here. Mr. Mink has pled sufficient facts to state a facially plausible claim that Ms. Knox's input into and advice concerning the affidavit and warrant directly caused the purportedly unconstitutional search of his house. Our precedent and *Iqbal* lead to the same result because we rely on *Poolaw* and

(continued...)

-9-

883 F.2d 842, 864 (10th Cir. 1989) (concluding defendant was sufficiently involved in entire decision-making process and thus personally liable where Personnel Advisory Board listened to defendant's recommendation and, to some extent, relied on it).

On appeal, Ms. Knox urges us to affirm the district court's *sua sponte* conclusion that the complaint should be dismissed because it did not specifically allege that Ms. Knox reviewed the warrant as well as the affidavit. We decline to do so. Notably, as Mr. Mink points out, both the affidavit and search warrant were attached to the amended complaint, and Ms. Knox's own affidavit subsequently indicated that the warrant was one of the documents she reviewed, in accordance with COLO. REV. STAT. § 20-1-106.1.[6] Being well aware that she had reviewed the warrant no doubt explains why Ms. Knox never moved to dismiss the complaint on this basis.

More importantly, taking Mr. Mink's allegations as true, viewing them in the light most favorable to him, and making all reasonable inferences in his favor,

---

[5](...continued)
*Snell*'s legal standard of liability for defendant's personal participation, not for supervisory liability.

[6] The statute provides:
(1) The district attorneys of the several judicial districts in the state of Colorado shall:
(a) Render . . . legal advice to peace officers, upon the request of such officers or of the court, pertaining to the preparation and review of *affidavits and warrants* for arrests, searches, seizures, . . .
COLO. REV. STAT. § 20-1-106.1 (emphasis added).

as we are required to do, persuades us that the amended complaint plausibly asserted the requisite casual connection between Ms. Knox's conduct and the search and seizure that occurred at Mr. Mink's home. The amended complaint not only alleged that Ms. Knox "reviewed and approved the affidavit submitted to the state district court in support of the warrant to search the Mink's home," Aplt. App., vol. I at 117, 119, it also alleged that she "authorized and caused an unlawful search[,]" *id*. at 118, that "[a] reasonable prosecutor would have known that the *warrant* failed to meet the particularity requirement of the Fourth Amendment[,]" *id*. at 119 (emphasis added), and that "[a] reasonable prosecutor would have known that the affidavit failed to establish probable cause to search and seize *the items described in the warrant.*" *Id.* (emphasis added). These allegations, coupled with the attachment of the warrant and affidavit to the complaint, support the reasonable factual inference that Ms. Knox reviewed the warrant as well as the affidavit, and that her approval set in motion a series of events that she knew or reasonably should have known would cause others to deprive Mr. Mink of his constitutional rights.

**B.**
**Mr. Mink's Allegations, If True,**
**Establish a Constitutional Violation**

Mr. Mink alleged that the search and seizure of his property based on an invalid warrant violated his Fourth Amendment rights. Three conditions must be

-11-

met for searches and seizures pursuant to a warrant to be constitutional.

> First, warrants must be issued by neutral, disinterested magistrates. Second, those seeking the warrant must demonstrate to the magistrate their probable cause to believe that the evidence sought will aid in a particular apprehension or conviction for a particular offense. Finally, warrants must particularly describe the things to be seized, as well as the place to be searched.

*Dalia v. United States*, 441 U.S. 238, 255 (1979) (internal citations and quotation marks omitted). These requirements ensure "that no intrusion in the way of search or seizure occurs without a careful prior determination of necessity, and preventing the specific evil of the general warrant abhorred by the colonists." *Bowling*, 584 F.3d at 967; *see also Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971); *Cassady v. Goering*, 567 F.3d 628, 634-35 (10th Cir. 2009). Mr. Mink alleged that the warrant used to search and seize his property lacked both probable cause and particularity.

## 1. Probable Cause

The first question is whether there was probable cause to believe that Mr. Mink's publication of *The Howling Pig* violated the Colorado criminal libel statute. "The substance of all the definitions of probable cause is a reasonable ground for belief of guilt." *Brinegar v. United States*, 338 U.S. 160, 175 (1949) (internal quotation marks omitted). "Probable cause exists when there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Grubbs,* 547 U.S. 90, 95 (2006). Mr. Mink alleged that the warrant lacked probable cause because no reasonable prosecutor could have

-12-

believed that publishing *The Howling Pig* constituted a crime.

Probable cause exists if "facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Bowling*, 584 F.3d at 969 (quoting *Brinegar*, 338 U.S. at 175-76 (internal quotation marks omitted)); *see also York v. City of Las Cruces*, 523 F.3d 1205, 1210 (10th Cir. 2008). The question therefore becomes whether a government official of reasonable caution, having reviewed the affidavit and the editorial column of *The Howling Pig*, would believe that this publication was libelous.

It goes without saying that a government official may not base her probable cause determination on an "unjustifiable standard," such as speech protected by the First Amendment. *Wayte v. United States*, 470 U.S. 598, 608 (1985) ("the decision to prosecute may not be deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification, including the exercise of protected statutory and constitutional rights.") (internal quotations marks and citations omitted)); *see also Swiecicki v. Delgado*, 463 F.3d 489, 498 (6th Cir. 2006) ("an officer may not base his probable-cause determination on speech protected by the First Amendment."); *Sandul v. Larion*, 119 F.3d 1250, 1255-56 (6th Cir. 1997) (where plaintiff's speech did not constitute fighting words and was thereby protected speech, it could not serve as basis for violation of city

ordinances at issue).  We thus turn to whether Mr. Mink's speech was protected by the First Amendment.

### a. First Amendment and Defamation

For centuries, the common law has afforded a cause of action to a person whose reputation has been damaged by the publication of false and defamatory statements.  *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 11-12 (1990) (citing L. Eldredge, LAW OF DEFAMATION 5 (1978)).  A passage from Shakespeare's Othello is often quoted in explanation.

> Who steals my purse steals trash …
> But he that filches from me my good name
> Robs me of that which not enriches him,
> And makes me poor indeed.

*Id*. (quoting Act III, scene 3).

Nevertheless, the Supreme Court has recognized a number of constitutional limits on various categories of speech which may be the subject of state defamation actions, *see id.* at 14-18, in order to maintain a balance between the protection of one's individual reputation and the freedom of speech of another person, *see id.* at 22-23.  After all, "[w]hatever is added to the field of libel is taken from the field of free debate," *New York Times Co. v. Sullivan*, 376 U.S. 254, 272 (1964), as well as from "individual liberty" and "the common quest for truth and the vitality of society as a whole."  *Hustler Magazine, Inc. v. Falwell,* 485 U.S. 46, 51 (1988).  Moreover,

> [t]he First Amendment is not limited to ideas, statements, or

-14-

positions which are accepted; which are not outrageous; which are decent and popular; which are constructive or have some redeeming element; or which do not deviate from community standards and norms; or which are within prevailing religious or moral standards. . . . The First Amendment standards are not adjusted to a particular type of publication or particular subject matter.

*Pring v. Penthouse Int'l, Ltd.*, 695 F.2d 438, 443 (10th Cir. 1982).

In balancing individual reputation and freedom of speech, the Court has identified various culpability requirements. *See generally Milkovich*, 497 U.S. at 14-20. *New York Times* recognized the need for "a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'- that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 14 (quoting *New York Times*, 376 U.S. at 279-280). The Court extended the *New York Times* rule to "public figures" in *Curtis Publishing Co. v. Butts*, 388 U.S. 130 (1967). In *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974), the Court held that although "the *New York Times* malice standard was inappropriate for a private person attempting to prove he was defamed on matters of public interest," nevertheless states may not "impose liability without requiring some showing of fault," or "permit recovery of presumed or punitive damages on less than a showing of *New York Times* malice." *Milkovich*, 497 U.S. at 15-16 (citing *Gertz*, 418 U.S. at 344-45, 347-48, 350).

As to the "constitutional limits on the *type* of speech which may be the subject of state defamation actions," *id.* at 16, "the *Bresler-Letter Carriers-*

-15-

*Falwell* line of cases provides protection for statements," such as parody, fantasy, rhetorical hyperbole, and imaginative expressions, "that cannot 'reasonably [be] interpreted as stating actual facts' about an individual," *id.* at 20 (internal citation omitted). Because no reasonable person would take these types of speech as true, they simply cannot impair one's good name.[7] *See id.* at 16-17 (discussing *Bresler*, 398 U.S. at 13; *Letter Carriers*, 418 U.S. at 284, 286; *Falwell*, 485 U.S. at 50); *see also Falwell*, 485 U.S. at 57. "This provides assurance that public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation." *Milkovich*, 497 U.S. at 20.

To determine whether a statement purports to state actual facts about an individual, the Court scrutinizes the meaning of the statement in context. *Id.* at 16-17 ("Rejecting a contention that liability could be premised on the notion that the word 'blackmail' implied the developer had committed the actual crime of blackmail, we held that 'the imposition of liability on such a basis was constitutionally impermissible – that as a matter of constitutional law, the word 'blackmail' in these circumstances was not slander when spoken, and not libel when reported in the Greenbelt News Review.'" (quoting *Greenbelt Cooperative Publishing Assn., Inc. v. Bresler*, 398 U.S. 6, 13 (1970)); *id.* at 17 ("Use of the

---

[7] Civil and criminal libel cases "are subject to the same constitutional limitations." *Herbert v. Lando*, 441 U.S. 153, 157 n.1 (1979) (citing *Garrison v. Louisiana*, 379 U.S. 64 (1964)).

-16-

word 'traitor' in literary definition of a union 'scab' not basis for a defamation action under federal labor law since used 'in a loose, figurative sense' and was 'merely rhetorical hyperbole, a lusty and imaginative expression of the contempt felt by union members.'" (quoting *Letter Carriers v. Austin*, 418 U.S. 264, 284, 286 (1974)); *Falwell*, 485 U.S. at 57 (a state emotional distress "claim cannot, consistently with the First Amendment, *form a basis* for the award of damages when the conduct in question is the publication of a caricature such as the ad *parody* involved here." (emphasis added)). "Context is crucial and can turn what, out of context, appears to be a statement of fact into 'rhetorical hyperbole,' which is not actionable." *Ollman v. Evans*, 750 F.2d 970, 1000 (D.C. Cir. 1984) (en banc) (Bork, J., concurring); *see also id.* at 983-84.

Even false statements of fact are protected from a defamation claim if any reasonable person would recognize the statements as parody. As the Court held in *Falwell*, 485 U.S. at 48, 53-57, an ad parody of the Reverend Jerry Falwell, in which he purportedly stated during an interview that his "first time" was during "a drunken incestuous rendezvous with his mother in an outhouse," constituted a caricature of him which no one reasonably would consider to be true, even though Reverend Falwell could have proved the assertion of an incestuous relationship with his mother to be absolutely false. *See also Ollman*, 750 F.2d at 1000 ("It is not unusual to protect false statements of fact "where, because of the context, they would have been understood as part of a satire or fiction.") (Bork, J.,

-17-

concurring and citing *Pring*, 695 F.2d at 443).

Although the Supreme Court has not yet squarely addressed whether fantasy, parody, rhetorical hyperbole, or imaginative expression is actionable in a case where a plaintiff is neither a public figure nor the speech on a matter of public concern, this circuit and at least one other circuit have done so. In *Pring*, 695 F.2d 438, we held, "The plaintiff urges that this constitutional doctrine should apply only to public figures, but there is no such limitation . . . ."[8] In *Levinsky's Inc. v. Wal-Mart Stores, Inc.*, 127 F.3d 122 (1st Cir. 1997), the court concluded that a portion of the statements claimed by a private person to be defamatory were constitutionally protected, stating:

> The First Amendment's shielding of figurative language reflects the reality that exaggeration and non-literal commentary have become an integral part of social discourse. For better or worse, our society has long since passed the stage at which the use of the word "bastard" would occasion an investigation into the target's lineage or the cry "you pig" would prompt a probe for a porcine pedigree. Hyperbole is very much the coin of the modern realm. In extending full constitutional protection to this category of speech, the *Milkovich* Court recognized the need to segregate casually used words, no matter how tastelessly couched, from fact-based accusations.

*Id.* at 128. Applying this analysis, the court held that the word "trashy" was hyperbole and therefore shielded from defamation liability notwithstanding the court's inability to determine whether the context of the statement involved a

---

[8] Thus, the district court was incorrect when it stated that "the question of whether this 'opinion, parody, and hyperbole' exception extends to statements about private figures on matters of private concern does not appear to be resolved in this circuit." *Mink II,* 566 F. Supp. 2d at 1226. *Pring*, 695 F.2d at 442, has settled this matter.

matter of public concern.  *See id.* at 130, 132-34.

Our holding in *Pring*, reiterating and applying the test in the context of a private figure on a matter of private concern, is an inevitable explication of the focal point of the Court's analysis in *Bresler*, 398 U.S. at 13, and *Letter Carriers*, 418 U.S. at 284, 286.  *See Pring*, 695 F.2d at 440-43 (stating that its holding "is clearly the message in *Greenbelt* [*Bresler*] and *Letter Carriers*.").  *Pring* emphasized that in all cases involving fantasy, parody, rhetorical hyperbole, or imaginative expression, the constitutional inquiry in deciding whether a statement is actionable remains the same: whether the charged portions, in context, could be reasonably understood as describing actual facts about the plaintiff or actual events in which he participated.  *Id.*; *see also Falwell*, 485 U.S. 46, 50 (without taking plaintiff's public figure status into account in reaching its conclusion, the Court declined to attach liability where "speech could not reasonably have been interpreted as stating actual facts about the public figure involved."); *Bresler*, 398 U.S. 6, 14 (same, declining to attach liability where "even the most careless reader must have perceived that the word was no more than rhetorical hyperbole."); *Letter Carriers*, 418 U.S. at 285 (same, declining to attach liability, and finding it "impossible to believe that any reader . . . would have understood the newsletter to be charging the appellees with committing the criminal offense of treason."); *Levinsky's*, 127 F.3d at 127-34 (segregating the constitutionally actionable and non-actionable statements about a private plaintiff and addressing

the "public concern" issue only as to the actionable category in determining whether there were any constitutional limitations on recoverable damages). This makes sense because if a statement of fact is clearly a spoof, or satirical as in *Falwell*, it matters not if the outrageously stated facts are false because no one would believe them to be true.[9]

The test of what a particular statement could reasonably be understood to have asserted is what a *reasonable reader* would understand the author to be saying, considering the kind of language used and the context in which it is used. *See Milkovich*, 497 U.S. at 16-20; *Bresler*, 398 U.S. at 14 ("[E]ven the most careless reader must have perceived that the word was no more than rhetorical hyperbole . . . ."); *Towne v. Eisner*, 245 U.S. 418, 425 (1918) ("A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used.").

Following this path, we held in *Pring*:

The test is not whether the story is or is not characterized as "fiction," "humor," or anything else in the publication, but whether the charged portions in context could be reasonably understood as describing actual facts about the plaintiff or actual events in which

---

[9] Accordingly, if we determine that the charged portions of *The Howling Pig* would not have been reasonably believed to be true statements about Professor Peake, it is not relevant to our analysis whether Mr. Peake was a public figure or speaking on a matter of public concern. *See Pring*, 695 F.2d at 442. For purposes of the probable cause analysis in this case, therefore, our inquiry ends if we determine that the charged portions of *The Howling Pig* could not be libelous – that is, could not reasonably be taken as true.

she participated. If it could not be so understood, the charged portions could not be taken literally. This is clearly the message in *Greenbelt* and *Letter Carriers*.

695 F.2d at 442 . We also noted that whether a statement could be reasonably understood as fact is a question of law. *Id.* ("Justice White in his concurrence in *Greenbelt* suggests that [the question of reasonableness] was there a jury question. The majority, however, regarded it as a matter of law."). Other courts agree that "*Pring* appropriately sets the standard for liability in cases of satire or parody." *New Times, Inc. v. Isaacks,* 146 S.W.3d 144, 156 (Tex. 2004); *id.* (collecting cases);[10] *id.* (stating that in "*Falwell*, the district court incorporated the

---

[10]  *Isaacks* cites to other courts' opinions that have adopted variations of the *Pring* test:

> *Dworkin v. Hustler Magazine, Inc.*, 867 F.2d 1188, 1193-94 (9th Cir. 1989) (Hustler features mentioning Dworkin's name in a derogatory fashion were "privileged opinion" because they could not be "reasonably understood as statements of fact."); *San Francisco Bay Guardian, Inc. v. Superior Court*, 21 Cal. Rptr. 2d 464, 467 (Cal. Ct. App. 1993) (average reader would recognize phony letter to the editor as "a fake and a joke"); *Walko v. Kean College*, 561 A.2d 680, 683 (N.J. Super. Ct. Law Div. 1988) ("A parody or spoof that no reasonable person would read as a factual statement, or as anything other than a joke – albeit a bad joke – cannot be actionable as a defamation.") (citing *Pring*); *Myers v. Boston Magazine Co., Inc.*, 403 N.E.2d 376, 379 (Mass. 1980) (reasonable reader would not understand satire to state actual fact); *Garvelink v. Detroit News*, 522 N.W.2d 883, 886 (Mich. Ct. App. 1994) (As a matter of law, satirical article could not "reasonably be interpreted as stating actual facts about the plaintiff and . . . is, therefore, protected speech."); *Hoppe v. Hearst Corp.*, 770 P.2d 203, 206 (Wash. Ct. App. 1989) (adopting *Pring* test and holding that parody was non-actionable as a matter of law).

(continued...)

*Pring* test into the jury instructions on Falwell's libel claim," resulting in the jury's finding that "the Hustler ad parody could not 'reasonably be understood as describing actual facts about [respondent] or actual events in which [he] participated.'") (citing *Falwell,* 485 U.S. at 52, 57; *Milkovich*, 497 U.S. at 20). We apply these tests to the references to Professor Peake in *The Howling Pig.*

### b. *Junius Puke Is a Parody of Professor Peake*

The dispositive question is whether a reasonable person would conclude that the statements in *The Howling Pig* were actual statements of fact about Mr. Peake, or attributable to him, rather than a satirical spoof. For the reasons stated below, we conclude that the answer is no.

As we have noted, *The Howling Pig* humorously altered Mr. Peake's

---

(...continued)
*Isaacks*, 146 S.W.3d at 156-158; *see also Browning v. Clinton*, 292 F.3d 235, 248 (D.C. Cir. 2002) ("'Hyperbole' is protected from defamation claims due to the 'constitutional protection afforded to parody, satire, and other imaginative commentary'") (quoting *Moldea v. New York Times Co.*, 22 F.3d 310, 313 n.2, 314 (D.C. Cir. 1994)); *Hamilton v. Prewett*, 860 N.E.2d 1234, 1244-45 (Ind. Ct. App. 2007) ("[P]arody and defamation are two separate classes of speech: 'defamation' is speech that is a false statement of fact and 'parody' is speech that one cannot reasonably believe to be fact because of its exaggerated nature."); *Victoria Square, LLC v. Glastonbury Citizen*, 891 A.2d 142, 145 (Conn. 2006) ("[d]efamation is, by its nature, mutually exclusive of parody ... [a] false statement that is published as a parody cannot be defamatory"); *Kiesau v. Bantz*, 686 N.W.2d 164, 176-77 (Iowa 2004) (referring to parody as an "affirmative defense" to plaintiff's defamation claim); *Stien v. Marriott Ownership Resorts, Inc.*, 944 P.2d 374, 380 (Utah Ct. App. 1997) ("[a] parody or spoof that no reasonable person would read as a factual statement, or as anything other than a joke[,] cannot be actionable as a defamation") (quoting *Walko,* 561 A.2d at 683)); 50 Am. Jur. 2d Libel and Slander § 156 ("Defamation is by its nature mutually exclusive of parody.").

photograph to create the character of Junius Puke, its "editor." Another photo

was altered to depict Mr. Peake/Puke made up as a character in the rock band

KISS. Junius Puke covered subjects and used language that Mr. Peake, a

professor of finance, surely would not have. For example, the editorial said:

> This will be a regular bitch sheet that will speak truth to power,
> obscenities to clergy, and advice to all the stoners sitting around
> watching Scooby Doo.
> This will be a forum for the pissed off and disenfranchised in
> Northern Colorado, basically everybody.
> I made it to where I am through hard work, luck, and connections, all
> without a college degree.
> Dissatisfaction with a cushy do-nothing ornamental position led me
> to form this subversive little paper.
> I don't normally care much about the question of daycare since my
> kids are grown and other people's children give me the willies[.]

Aplt. App., vol. I at 147-48. Significantly, *The Howling Pig* editorials even

contained an express disclaimer regarding the editor:

> The Howling Pig would like to make sure that there is no possible
> confusion between our editor Junius Puke and the Monfort
> Distinguished Professor of Finance, Mr. Junius "Jay" Peake. Mr.
> Peake is an upstanding member of the community as well as an asset
> to the Monfort School of Business where he teaches about
> microstructure. Peake is active in many community groups, married
> and a family man. He is nationally known for his work in the
> business world, and has consulted on questions of market structure.
> Junius Puke is none of those things and a loudmouth know-it-all to
> boot, but luckily he's frequently right and so is a true asset to this
> publication.

*Id*. at 146. According to the search warrant affidavit itself:

> The picture [of Junius Peake] has been altered to include sunglasses,
> a smaller nose and a small moustache similar to that of Hitler's. The
> person in the photograph is identified on the website as Junius Puke.
> The picture is accompanied by a biography of Mr. Puke. According

-23-

to the site, its purpose is to draw attention to issues rampant in Northern Colorado and Elsewhere [sic].

Ex. B at 3.

Balanced against all this, Detective Warren provided Mr. Peake's complaint to him as the sole basis of the alleged defamatory content articulated in the affidavit. Thus, the affidavit said that "[Mr. Peake] told Detective Warren that the statements made on the website about him are false." *Id.* When asked to provide some examples, Mr. Peake cited the following:

> 1) The website uses his photograph and identifies him as the Editor in Chief Junius Puke.
> 2) The website states that he "gambled in tech stocks" in the 90's.
> 3) The website states: The dark glasses are to avoid being recognized since he fears the good natured ribbing of his colleagues on Wall Street where he managed to luck out and ride the tech bubble of the nineties like a $20 whore and make a fortune.
> 4) The website contains many opinions and articles about The University of Northern Colorado, the Greeley Community and Northern Colorado. As this is an "editorial" column, those statements are attributed to Mr. Puke, and therefore Mr. Peak [sic]. Mr. Peak [sic] feels that these opinions are not his but have been attributed to him.

*Id.* at 3-4.

The test is not how Mr. Peake would characterize *The Howling Pig*'s editorial column, but how a reasonable person would understand those statements in that context. *See Pring*, 695 F.2d at 442. In our judgment, the district court reached the only possible conclusion in its January 9, 2004 order granting the temporary restraining order. "[W]hat's written in this case is satire. . . . [A]s written it is crass and vulgar, but that makes it no less protected by the First

-24-

Amendment." Aplt. App., vol. II. at 589-90. "[T]his is the purest of speech which has been tolerated by all but tyrants and despots from ancient times." *Id*. at 590. It is apparent from our review of the charged portions of the column on the editorial page of *The Howling Pig* that no reasonable reader would believe that the statements in that context were said by Professor Peake in the guise of Junius Puke, nor would any reasonable person believe they were statements of fact as opposed to hyperbole or parody. The comments asserted as defamation constituted satire in its classic sense. As such, they are protected speech under the First Amendment, and a state may not deem them to constitute libel, particularly criminal libel. *See Milkovich*, 497 U.S. at 16-17 (quoting *Bresler*, 398 U.S. at 13). The district attorney recognized as much when he concluded that *The Howling Pig* could not be prosecuted under the statute. *See Mink I*, 482 F.3d at 1250.

Because a reasonable person would not take the statements in the editorial column as statements of facts by or about Professor Peake, no reasonable prosecutor could believe it was probable that publishing such statements constituted a crime warranting search and seizure of Mr. Mink's property.

## 2. *Particularity Requirement*

Mr. Mink also alleged that the warrant used to search and seize his property lacked the particularity required by the Fourth Amendment. The district court agreed, stating that "[u]nder the 'scrupulous' standard required by the Supreme

-25-

Court [for seizures of books and other materials protected by the First Amendment], I have no doubt the warrant in this case was overly broad." *Mink II,* 566 F. Supp. 2d at 1228. Ms. Knox challenges the district court's conclusion.

The Fourth Amendment requires that a search warrant describe with particularity the things to be seized in order to avoid a general exploratory rummaging of a person's belongings. *United States v. Campos*, 221 F.3d 1143, 1147 (10th Cir. 2000). The particularity requirement was included in the Fourth Amendment as a response to the evils of general warrants. *See id.* It "ensures that a search is confined in scope to particularly described evidence *relating to a specific crime* for which there is demonstrated probable cause." *Voss v. Bergsgaard*, 774 F.2d 402, 404 (10th Cir. 1985) (emphasis added). "As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." *United States v. Janus Indus.*, 48 F.3d 1548, 1553 (10th Cir. 1995) (quoting *Stanford v. Texas*, 379 U.S. 476, 485 (1965)).

A warrant is overly broad if it does not contain sufficiently particularized language that creates a nexus between the suspected crime and the items to be seized. *See Campos*, 221 F.3d at 1147; *United States v. Grimmett*, 439 F.3d 1263, 1271 (10th Cir. 2006). In *United States v. Otero*, 563 F.3d 1127 (10th Cir. 2009), we recognized that

> [t]he modern development of the personal computer and its ability to
> store and intermingle a huge array of one's personal papers in a
> single place increases law enforcement's ability to conduct a
> wide-ranging search into a person's private affairs, and accordingly

-26-

makes the particularity requirement that much more important. *See, e.g. United States v. Riccardi*, 405 F.3d 852, 863 (10th Cir. 2005) (warrant authorizing general search of computer invalid as it permitted officers to search anything "from child pornography to tax returns to private correspondence"); *United States v. Carey*, 172 F.3d 1268, 1272 (10th Cir.1999) (computer search for files pertaining to distribution of controlled substances uncovered child pornography).

*Id.* at 1132. We therefore held that "warrants for computer searches must

*affirmatively limit* the search to evidence of specific . . . crimes . . . ." *Id.*

(quoting *Riccardi*, 405 F.3d at 863 (emphasis added)).

Here, there was no reference anywhere in the warrant to any particular

crime, much less to the Colorado criminal libel statute. *See* Ex. A. The only

reference to a crime in the entire warrant was a citation to a portion of the

Colorado Rule of Criminal Procedure 41(b), which specified generally:

> A search warrant may be issued under this Rule to search for and seize any property:
> (1) Which is stolen or embezzled; or
> (2) Which is designed or intended for use as a means of committing *a criminal offense*; or
> (3) Which is or has been used as a means of committing *a criminal offense*; or
> (4) The possession of which is illegal; or
> (5) Which would be material evidence in *a subsequent criminal prosecution* in this state or in another state . . .

Colo. R. Crim. P. 41(b) (2003) (emphasis added).

The warrant authorized the search and seizure of all computer and non-

computer equipment and written materials in Mr. Mink's house, without any

mention of any particular crime to which they might be related, essentially

authorizing a "general exploratory rummaging" through Mr. Mink's belongings

-27-

for any unspecified "criminal offense." *See Campos*, 221 F.3d at 1147; *see also Cassady*, 567 F.3d at 637 (holding that a warrant permitting "search for all evidence of any crime [is] invalid.").[11]  No paragraph tied the listed items to any particular crime.  The warrant was therefore clearly invalid under the particularity clause of the Fourth Amendment.

Based on the foregoing, viewing the amended complaint in the light most favorable to the nonmoving party, Mr. Mink, and drawing all reasonable inferences in his favor, *see Archuleta,* 523 F.3d at 1282-1283, we conclude the complaint plausibly alleged that Ms. Knox violated Mr. Mink's constitutional right not to be served with an overbroad warrant lacking any particularity.

## C.
### The Law Was Clearly Established at the Time the Alleged Violations Occurred

The prong of the qualified immunity test requiring that the law be clearly established is easily satisfied here.  Ms. Knox's review of the affidavit and warrant occurred in December 2003.  Long before that, it was clearly established in this circuit that speech, such as parody and rhetorical hyperbole, which cannot reasonably be taken as stating actual fact, enjoys the full protection of the First Amendment and therefore cannot constitute the crime of criminal libel for

---

[11] The amended complaint alleged that this is exactly how the officer executing the warrant read it: "Detective Warren [told Mr. Mink] that he could take 'everything in the house' if he wanted."  Aplt. App., vol. I at 108.

-28-

purposes of a probable cause determination. *Pring*, 695 F.2d at 442. Moreover, it was also clearly established that warrants must contain probable cause that a *specified crime* has occurred and meet the particularity requirement of the Fourth Amendment in order to be constitutionally valid. *Voss*, 774 F.2d at 404 ("The particularity requirement ensures that a search is confined in scope to particularly described evidence relating to a specific crime for which there is demonstrated probable cause.")

Ms. Knox insists that this case is factually analogous to *Douglas v. Dobbs*, 419 F.3d 1097 (10th Cir. 2005), *cert. denied*, 546 U.S. 1138 (2006), thereby meriting the conclusion that the law was not clearly established that her conduct violated the Constitution. We disagree. In *Douglas*, an assistant district attorney (ADA) authorized a police officer to seek a warrant to conduct an investigatory search of the plaintiff's prescription drug records. Because we concluded the plaintiff "failed to demonstrate that the ADA violated a clearly established constitutional right," *id.* at 1099, 1103, we held that she was entitled to qualified immunity. *Id.* Unlike in *Douglas*, the constitutional rights Mr. Mink relies on were clearly established in this circuit at the time of Ms. Knox's conduct.

**III.**

In sum, we conclude the amended complaint plausibly alleged that Ms. Knox violated Mr. Mink's clearly established constitutional rights. Accordingly,

we **REVERSE** the district court's decision granting Ms. Knox's motion to dismiss and **REMAND** for further proceedings consistent with this opinion.

08-1250, *Mink v. Knox*

**GORSUCH,** Circuit Judge, concurring.


I agree with the court's holding in all respects and join its reasoning with one minor exception. Even with respect to that exception, I agree with the result the court reaches, arriving at a common destination but only by a different route.

The question the court confronts in Section II.B.1.a is whether probable cause existed to think that Mr. Mink's column constituted "criminal libel." I agree with my colleagues that the answer to that question must be "no." I reach this conclusion for a simple and straightforward reason: this court has already said so. *Pring v. Penthouse International, Ltd.*, 695 F.2d 438 (10th Cir. 1982), established in this circuit the rule that the First Amendment precludes defamation actions aimed at parody, even parody causing injury to individuals who are not public figures or involved in a public controversy. *Pring* is binding on us, answers the probable cause question at issue, and is thus the beginning and end of my inquiry on that question.

After noting *Pring* controls, the majority proceeds in Section II.B.1.a to offer a lengthy new defense of that decision. The majority may be right in all it says. But this isn't beyond peradventure. As the majority notes, the Supreme Court has yet to address how far the First Amendment goes in protecting parody. Maj. Op. at 18. And reasonable minds can and do differ about the soundness of a rule that precludes private persons from recovering for reputational or emotional

damage caused by parody about issues of private concern.  One might argue, for example, that such a rule unnecessarily constitutionalizes limitations that state tort law already imposes.  *See, e.g.*, *Stien v. Marriott Ownership Resorts, Inc.*, 944 P.2d 374, 380 (Utah Ct. App. 1997) ("Under the law of defamation, '[a] parody or spoof that no reasonable person would read as a factual statement, or as anything other than a joke[,] . . . cannot be actionable as a defamation.'" (quoting *Walko v. Kean College*, 561 A.2d 680, 683 (N.J. Super. Ct. 1988))); Maj. Op. at 21-22 n.10 (citing state cases, some of which rest their holdings on common law, not constitutional, grounds).  Or that such a rule may unjustly preclude private persons from recovering for intentionally inflicted emotional distress regarding private matters, in a way the First Amendment doesn't compel.  *See, e.g.*, Catherine L. Amspacher & Randel Steven Springer, Note, *Humor, Defamation and Intentional Infliction of Emotional Distress: The Potential Predicament for Private Figure Plaintiffs*, 31 Wm. & Mary L. Rev. 701 (1990); Robert C. Post, *The Constitutional Concept of Public Discourse: Outrageous Opinion, Democratic Deliberation, and* Hustler Magazine v. Falwell, 103 Harv. L. Rev. 601, 662 (1990) (arguing that the First Amendment does not "absolutely protect[] all verbal means of intentionally inflicting emotional distress, all forms of racial, sexual, and religious insults, so long as the offending communications do not contain false factual statements").

Respectfully, I would avoid these thickets.  Whoever has the better path

through them, it's better yet that we sidestep them altogether.  To decide the case currently before us, it's enough to say we are bound by *Pring*, and so was the district court.  Beyond that, I would not venture.  *See PDK Labs., Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment) ("[I]f it is not necessary to decide more, it is necessary not to decide more.").  Accordingly, I join all but Section II.B.1.a of the court's opinion and concur in its judgment.

STATE OF COLORADO )
) ss.
COUNTY OF WELD ) NO._____ DIVISION _____

IN THE _District_ COURT
NINETEENTH JUDICIAL DISTRICT

## SEARCH WARRANT

THE PEOPLE OF THE STATE OF COLORADO:

TO: Any officer authorized by law to execute a search warrant in the County wherein the property is located:

Ken Warren, having this date filed an Affidavit for a Search Warrant in conformity with the provisions of Colorado Rules of Criminal Procedure, 41(b) and (c), for the following described property, to-wit:

1) Any and all computer systems and computer equipment to include, but not limited to, central processing units and circuit boards attached or unattached to the computer system.

2) Any and all storage media to include, but not limited to, floppy diskettes, hard disk drives, removable disk drive cartridges and drives, magnetic computer tapes, compact disks, and any other device capable of storing information in a magnetic/optical form, whether internal or external to the computer system, attached or unattached to the computer system.

3) Any and all computer peripheral devices attached or unattached to the computer to include but not limited to computer monitors, printers, keyboards, modems, or other physical devices which serve to transmit or receive information to and from the computer.

4) Any and all documents which serve the purpose of explaining the way in which the computer hardware, programs, and data are used, including manuals for computer equipment or software, printouts of computer programs, data files, or other information which has been or continues to be stored electronically or magnetically in the computer system.

5) Any and all computer programs or software used in the operation of the computer system, used to transmit or receive information, used to display or print graphics or other types of files, and all other computer programs and software associated with the computer system to include all programs stored on the computer, floppy disk, CD's, or other storage media.

6) Any and all papers, documents, or other readable material, whether generated by handwriting, typewriter, computer or other device, which contains names, addresses, or telephone numbers, and passwords for this, or other computer systems.

7) Any and all correspondence, diaries, memoirs, journals, personal reminiscences electronic mail (e-mail), letters, notes, memorandum, or other communications in written or printed form.

8) Indicia of occupancy consisting of articles of personal property tending to establish the identity of the person or persons in control of the premises at 310 West 5th St, Ault, Weld County, Colorado, including, but not limited to rent receipts, canceled mail, keys, utility bills and telephone bills.

9) Any and all passwords, encryption keys, access codes or other security or privacy devices, whether of a physical, written or oral form, used to encrypt, encode, or otherwise limit access to information, files, programs, accounts or other data associated with or stored on the computer.

135

10) Any proof of ownership or maintenance of control of electronic or computer related equipment, programs, data, or documentation at that address including correspondence, invoices, or similar items.

11) Your affiant is seeking permission to examine the computer and storage devices for any and all data, correspondence, electronic mail, voice messages, letters, notes, ledgers, spreadsheets, documents, memorandum, image, video, sound or graphic files for evidence of, or the presence of:

Any connection by this computer to the website "www.geocities.com/thehowlingpig/" to include evidence of email generated by the Web Site "www.geocities.com/thehowlingpig/" and forwarded to or accessed by this computer.

Any evidence of documents prepared or stored on this computer which relate to the website "www.geocities.com/thehowlingpig/".

Any evidence relating to the creation, access (log-in) or maintenance of the website "www.geocities.com/thehowlingpig/".

Any and all passwords, encryption keys, access codes or other security or privacy devices, whether of a physical, written or oral form, used to encrypt, encode, or otherwise limit access to information, files, programs, accounts or other data associated with or stored on the computer.

Any proof of ownership, maintenance or control of the computer related equipment, programs, data, correspondence, invoices, registration keys, or similar items.

Any and all diaries, memoirs, journals, personal reminiscences, correspondence, letters, notes, memorandum, stories, electronic mail or other communications in written or oral form, stored on the computer evidence seized as those items may relate to the allegations.

believed to be situated (on the person) (at the place) or (in the vehicle) known as:

310 5th W St
Ault, Colorado
A light Brown, single story, single family dwelling.
With brick on the lower portion of the outside.
The address 310 is prominently posted next to the porch light
on the East side of the front door. This house is the 3rd house east of Ash
on south side of 5th Street.

upon one or more grounds as set forth in Rule 41(b), Colorado Rules of Criminal Procedure, namely:

(1)    is stolen or embezzled;

136

(2)   is designed or intended for use or which is or has been used as a means of committing a criminal offense or the possession of which is illegal;

(3)   would be material evidence in a subsequently criminal prosecution;

The names of persons whose affidavits have been taken in support hereof are: Ken Warren, and I am satisfied that there is probable cause to believe that the property so described is located on the person, premises or in the vehicle above described, YOU ARE THEREFORE COMMANDED to search forthwith the person, place, or vehicle above described, for the property described at any time, day or night. This Warrant shall be executed within ten (10) days of the date the Warrant is issued. The return shall be made promptly and shall be accompanied by a written inventory of all property taken. You shall deliver to the person from whom the property is taken or from whose premises or vehicle the property is taken a copy of this Warrant together with a receipt for the property taken or, in lieu thereof, to leave the copy and receipt at the place from which the property is taken; and to deliver to the issuing judge a written inventory of the property with the return of this Warrant.

Dated this _____ day of _____ DEC 1 2 2003, 2003, at Weld County, Colorado, at _____ A.M./P.M.

_____
JUDGE

137

IN THE _District_ COURT, IN

AND FOR THE COUNTY OF WELD,

BEFORE JUDGE _03CR1_

Your affiant, **Ken Warren**, being first duly sworn, upon his oath says: that he has reason to believe that (on the person) (at the place) or (in the vehicle) known as:

> 310 5th W St
> Ault, Colorado
> A light Brown, single story, single family dwelling
> With brick on the lower portion of the outside.
> The address 310 is prominently posted next to the porch light
> on the East side of the front door. This house is the 3rd house east of Ash
> on south side of 5th Street.

there is now located certain property, to-wit:

1. Any and all computer systems and computer equipment to include, but not limited to, central processing units and circuit boards attached or unattached to the computer system.

2. Any and all storage media to include, but not limited to, floppy diskettes, hard disk drives, removable disk drive cartridges and drives, magnetic computer tapes, compact disks, and any other device capable of storing information in a magnetic/optical form, whether internal or external to the computer system, attached or unattached to the computer system.

3. Any and all computer peripheral devices attached or unattached to the computer to include but not limited to computer monitors, printers, keyboards, modems, or other physical devices which serve to transmit or receive information to and from the computer.

4. Any and all documents which serve the purpose of explaining the way in which the computer hardware, programs, and data are used, including manuals for computer equipment or software, printouts of computer programs, data files, or other information which has been or continues to be stored electronically or magnetically in the computer system.

5. Any and all computer programs or software used in the operation of the computer system, used to transmit or receive information, used to display or print graphics or other types of files, and all other computer programs and software associated with the computer system to include all programs stored on the computer, floppy disk, CD's, or other storage media.

6. Any and all papers, documents, or other readable material, whether generated by handwriting, typewriter, computer or other device, which contains names, addresses, or telephone numbers, and

passwords for this, or other computer systems.

7. Any and all correspondence, diaries, memoirs, journals, personal reminiscences electronic mail (e-mail), letters, notes, memorandum, or other communications in written or printed form.

8. Indicia of occupancy consisting of articles of personal property tending to establish the identity of the person or persons in control of the premises at 310 West 5th St, Ault, Weld County, Colorado, including, but not limited to rent receipts, canceled mail, keys, utility bills and telephone bills.

9. Any and all passwords, encryption keys, access codes or other security or privacy devices, whether of a physical, written or oral form, used to encrypt, encode, or otherwise limit access to information, files, programs, accounts or other data associated with or stored on the computer.

10. Any proof of ownership or maintenance of control of electronic or computer related equipment, programs, data, or documentation at that address including correspondence, invoices, or similar items.

11. Your affiant is seeking permission to examine the computer and storage devices for any and all data, correspondence, electronic mail, voice messages, letters, notes, ledgers, spreadsheets, documents, memorandum, image, video, sound or graphic files for evidence of, or the presence of:

Any connection by this computer to the website "www.geocities.com/thehowlingpig/" to include evidence of email generated by the Web Site "www.geocities.com/thehowlingpig/" and forwarded to or accessed by this computer.

Any evidence of documents prepared or stored on this computer which relate to the website "www.geocities.com/thehowlingpig/".

Any evidence relating to the creation, access (log-in) or maintenance of the website "www.geocities.com/thehowlingpig/".

Any and all passwords, encryption keys, access codes or other security or privacy devices, whether of a physical, written or oral form, used to encrypt, encode, or otherwise limit access to information, files, programs, accounts or other data associated with or stored on the computer.

Any proof of ownership, maintenance or control of the computer related equipment, programs, data, correspondence, invoices, registration keys, or similar items.

Any and all diaries, memoirs, journals, personal reminiscences, correspondence, letters, notes, memorandum, stories, electronic mail or other communications in written or oral form, stored on the computer evidence seized as those items may relate to the allegations.

which property:
(1) is stolen or embezzled.

(2) . is designed or intended for use or which is or has been used as a means of committing a criminal offense or the possession of which is illegal;

(3)    would be material evidence in a subsequent criminal prosecution;

Based upon the following facts:

Your affiant is a police officer for the City of Greeley Police Department and has gained the following information from reading the reports and speaking to fellow officers, from reading the statements of the victim and witnesses and through personal investigation.

Your affiant is currently assigned to the Greeley Police Department, Weld County Forensic Laboratory. Your affiant is responsible for conducting forensic computer analysis on evidence submitted, and for investigating Internet or online related investigations. Your affiant has undergone extensive training on the recovery and documentation of evidence relating to computers, Internet activity, and data recovery from digital media. Your affiant has been examining digital media in excess of Three (3) years.

On November 14th 2003, Junius Peak reported to the Greeley Police Department that he was the victim of what he believed was criminal libel. He reported to Detective Warren that he discovered an Internet Website at the address of **www.geocities.com/thehowlingpig**. He discovered this website after being sent a copy of the site printed by one of his colleagues at The University of Northern Colorado. He told Detective Warren that there were several copies of this site being passed around on campus.

Detective Warren went to the website via an Internet connection at the police department. Upon reading the articles posted on the website, Detective Warren found that the site was apparently designed with a logo that mimics that of The University of Northern Colorado. The website also has a picture of Junius Peak on the main page as well as other pages. The picture of Mr. Peak is from the University of Northern Colorado's Website. The picture has been altered to include sunglasses, a smaller nose and a small moustache similar to that of Hitler's. The person in the photograph is identified on the website as Junius Puke. The picture is accompanied by a biography of Mr. Puke. According to the site, its purpose is to draw attention to issues rampant in Northern Colorado and Elsewhere.

The body of the website includes three articles at the time of this affidavit. The articles consist of statements about various topics and persons relating to the Northern Colorado Area and The University of Northern Colorado. According to Mr. Peak, there are many statements in the website and its accompanying articles that are defamatory to his character. He told Detective Warren that the statements made on the website about him are false. He feels that the articles have brought him embarrassment and exposed him to public hatred, contempt and ridicule. He feels they have impeached his honesty, integrity, virtue, and reputation within the community.

When asked to site a few specific examples of this criminal libel, Mr. Peak cited the following examples:

1)  The website uses his photograph and identifies him as the Editor in Chief Junius Puke.

2)  The website states that he "gambled in tech stocks" in the 90's.

3)  The website states: The dark glasses are to avoid being recognized since he fears the good natured ribbing of his colleagues on Wall Street where he managed to luck out and ride the tech bubble of the nineties

66

like a $20 whore and made a fortune.

4) The website contains many opinions and articles about The University of Northern Colorado, the Greeley Community and Northern Colorado. As this is an "editorial" column, those statements are attributed to Mr. Puke, and therefore Mr. Peak. Mr. Peak feels that these opinions are not his but have been attributed to him.

A full printout of the site as it existed on November 19th is attached to this affidavit at "Attachment A". It consists of 6 pages including the cover.

Your affiant researched the website and found that it was hosted by Geocities.com. Geocities.com is owned and operated by Yahoo Inc. Your affiant contacted Yahoo and learned that they do archive information relating to the Internet connections established during the creation and maintenance of Geocities sites. They also maintain records to include email for any associated Yahoo accounts. There is a yahoo account associated with this site and its address is "thehowlingpig@yahoo.com". Yahoo told your affiant they will release this information upon the receipt of a court order.

Your affiant applied for and received an order for the production of the records held by Yahoo for the aforementioned Geocities website. These records included a listing of the connections and log-in activity for the website by anyone with credentials to log into the site. These records DO NOT reflect persons accessing the site, but not logging in (persons only reading the site). This connection information included a number of Internet Protocol Addresses that belong to ICG Telecom Group Inc.. Your affiant contacted ICG Telecom Group Inc., and spoke to a Subpoena Compliance Investigator named Carl Nixon. He advised your affiant that his company is a backbone provider for other Internet Service Providers (ISP). His company maintains dial in access and bandwidth (service) for other ISPs to resell to their customers. Carl Nixon told your affiant that they archive connection information for each transaction and that information may include ANI (Automatic Number Identification) or Caller ID information. Carl Nixon told your affiant that his company would produce this information as well as account holder (ISP) information for each connection, upon receipt of a Colorado Court Order.

Your affiant applied for and received a Court Order for records held by ICG Telecom Group Inc. On December 11th, 2003, your affiant received a fax response from ICG Telecom Group Inc. Subpoena Compliance Investigator Steffani Rink. The report Rink provided showed that all connections via ICG Telecom Group's equipment came from the residence telephone number 970-834-2715, as captured and reported by their system. All connections also showed the username "crysmink" and the connections were made on behalf of the Internet Service Provider Front Range Internet Inc. Your affiant researched this telephone number through public telephone record reverse lookup. The telephone number belongs to the residence 310 W 5th St, in the City of Ault, Weld County, Colorado. Your affiant also learned that this number is listed to Robert Mink. Your affiant checked records at the University of Northern Colorado. Your affiant learned that a student was registered at The University of Northern Colorado under the name Thomas Mink. His address also lists to 310 W 5th St in Ault, Co. Your affiant also learned from UNC, that his mother is listed as Crystal Mink which generally matches the username provided by Rink.

It is your affiant's training and experience that this information contained on computer media cannot be readily accessed at the location the computer is seized from. The computer will need to be removed, and processed in a forensic laboratory setting. This may involve imaging the media to be examined and then conducting an analysis

on that image. Processing the computer on scene may result in an incomplete examination and could result in destruction of data present on the media. Removal and examination in a controlled setting will prevent the destruction of data and will allow for a complete analysis.

Dated this ___12th___ day of ___December___, 2003.

_____
AFFIANT


This Affidavit, consisting of 5 pages, was subscribed and sworn to before me this ___12th___ day of ___December___, 2003.

_____
JUDGE

68