**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 29, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

MERCEDES ARCHULETA,

      Plaintiff - Appellee,

v.

MICHELLE WAGNER, a detective with the Lakewood Police Department, in her individual capacity; SHAYNE BUTLER, an officer with the Colorado Highway Patrol, in his individual capacity; TED MINK, Jefferson County Sheriff, in his official capacity,

      Defendants,

          and

D.L. MANDELKO, a jailer with the Jefferson County Jail, in her individual capacity,

      Defendant - Appellant.

No. 07-1108

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 06-cv-02061-LTB-MJW)**

---

Timothy MacDonald (Andrew S. Kelley, on the brief), Arnold & Porter, L.L.P., Denver, Colorado, for Plaintiff - Appellee.

Writer Mott, Assistant County Attorney (Ellen G. Wakeman, Acting County

Attorney and Patricia W. Gilbert, Assistant County Attorney, on the briefs), Jefferson County Attorney's Office, Golden, Colorado, for Defendant - Appellant.

Before **KELLY**, **LUCERO**, and **HARTZ**, Circuit Judges.

**KELLY**, Circuit Judge.

Defendant-Appellant D.L. Mandelko appeals from the district court's order denying her qualified immunity. In this civil-rights action, Plaintiff-Appellee Mercedes Archuleta alleged in pertinent part that Deputy Mandelko violated her Fourth and Fourteenth Amendment rights by strip searching her. See 42 U.S.C. § 1983. Ms. Archuleta was strip searched pursuant to an incorrect arrest warrant. We have jurisdiction because the district court's order rejecting Deputy Mandelko's assertion of a qualified-immunity defense on a motion to dismiss is a "final decision" under 28 U.S.C. § 1291, Johnson v. Fankell, 520 U.S. 911, 915 (1997), and affirm.

## Background

The correct standard for reviewing a motion to dismiss in a qualified-immunity case is the same as for dismissals generally. Moya v. Schollenbarger, 465 F.3d 444, 455 (10th Cir. 2006). The court of appeals is "limited to assessing the legal sufficiency of the allegations contained within the four corners of the complaint" and therefore all of the facts recounted below are taken directly from

that document. <u>Jojola v. Chavez</u>, 55 F.3d 488, 494 (10th Cir. 1995); <u>see</u> Aplt. App., tab 1 (Complaint).

On April 18, 2005, police from Lakewood, Colorado responded to a call regarding an altercation between two women at a Walgreens store. Upon their arrival, the alleged victim, Alexandria Silvas, told the police that she had a fight with her girlfriend who was no longer at the scene. Ms. Silvas told the authorities that she did not suffer any injuries, she did not wish to press charges, she had been involved in an intimate relationship with her girlfriend for the past three months, her girlfriend's name was Mercedes Archuleta, her girlfriend was approximately 42 to 43 years old, and she and her girlfriend both had outstanding arrest warrants. Ms. Silvas did not provide any other information. Police later found that there were no outstanding warrants for either Ms. Silvas or "Mercedes Archuleta."

According to a Colorado Bureau of Investigations database, a woman named Phyllis Rivera used the name "Mercedes Archuleta" as an alias. Based only upon the information supplied by Ms. Silvas and upon a call to Ms. Silvas's foster mother who had not heard from Ms. Silvas since November 2004, Detective Michelle Wagner of the Lakewood Police Department swore out an affidavit and obtained an arrest warrant for a "Mercedes Archuleta." This affidavit contained identifying information Detective Wagner found in motor-vehicle records for Plaintiff and Ms. Rivera's criminal history. The Lakewood Municipal Court then

issued an arrest warrant for "Mercedes Archuleta" for allegedly violating a municipal ordinance prohibiting "harassment," although it appears from the briefs that the arrest warrant listed "DV–Harassment" as the alleged crime pursuant to Colo. Rev. Stat. § 18-6-801.6.[1]  Aplt. Br. at 15; Aplee. Br. at 5.

On June 12, 2005, Ms. Archuleta—a 46-year-old mother of nine—and some of her children were riding in the family van driven by Ms. Archuleta's husband. They were stopped by Officer Shane Butler because there was an extra child in the back seat.  Although Ms. Archuleta's husband was the driver, Officer Butler requested Ms. Archuleta's driver's license in addition to her husband's.  Officer Butler took the licenses to his patrol car and, upon returning, told Ms. Archuleta to get out of the car, handcuffed her, and frisked her.  Officer Butler told her that she was under arrest pursuant to an arrest warrant for domestic violence and took her to the Jefferson County, Colorado Detention Facility.

At the facility, Ms. Archuleta was frisked two more times in the waiting area.  She pleaded mistaken identity with Deputy Mandelko, a booking officer on duty.  After Deputy Mandelko found the correct file on her computer, it was apparent to her that Ms. Archuleta did not have the moles or tattoos that the computer file stated she was supposed to have because Ms. Archuleta was

---

[1]  Colo. Rev. Stat. § 18-6-801.6 states that "[a]ny person completing or preparing a[n] . . . application for an arrest warrant shall indicate on the face of such document whether the facts forming the basis of the alleged criminal act, if proven, could constitute domestic violence as defined in section 18-6-800.3(1)."

wearing shorts and a sleeveless blouse. Deputy Mandelko asked Ms. Archuleta "where are your moles and tattoos?" and told a receptionist "this isn't her." Deputy Mandelko continued to process and strip search Ms. Archuleta nonetheless, knowing Ms. Archuleta was the wrong person, was not to be placed in the general prison population, and had not been charged with a crime involving weapons or drugs.

As she was standing naked, Ms. Archuleta began to lactate. Ms. Archuleta tried to cover herself but was told by Deputy Mandelko to put her arms down. Deputy Mandelko told a male jailer to cut a maxi-pad in half for Ms. Archuleta to use. He did so, although neither the male officer nor Deputy Mandelko were wearing gloves while handling the pad. Ms. Archuleta was continually mocked by Deputy Mandelko and the male officer during this incident and Deputy Mandelko told Ms. Archuleta that she knew she was innocent.

Ms. Archuleta was then taken to a holding room before being placed in a cell by herself for several hours. Her husband posted bail and she was released. The charges against her were eventually dismissed.

Ms. Archuleta filed a complaint on October 17, 2006 against Detective Wagner, Deputy Mandelko, Officer Butler, and Sheriff Ted Mink, the Jefferson County Sheriff, seeking a declaratory judgment, compensatory and punitive damages, and attorney fees and costs. On motions to dismiss, the district court dismissed some claims based upon assertions of qualified immunity. Archuleta v.

Wagner, No. 06-2061, 2007 WL 646317 (D. Colo. Feb. 27, 2007).  The district court dismissed a claim against Deputy Mandelko for unlawful seizure and deprivation of liberty without due process but allowed the claim against her for an unreasonable search arising out of the strip search to survive.  First, the district court reasoned that Deputy Mandelko had no duty to investigate Ms. Archuleta's claims of innocence and did not deprive Ms. Archuleta of due process by detaining her.  With respect to the strip-search claim, based upon the allegations in the complaint, the district court held that Deputy Mandelko could have violated Ms. Archuleta's clearly established constitutional rights because Ms. Archuleta had been patted down before the strip search, she was held alone in a cell while awaiting bail, and Deputy Mandelko had a subjective belief in Ms. Archuleta's innocence.  Deputy Mandelko appeals the district court's denial of qualified immunity on the strip-search claim.

## Discussion

We review the denial of qualified immunity de novo.  Eidson v. Owens, 515 F.3d 1139, 1145 (10th Cir. 2008).  "[G]overnment officials performing discretionary functions generally are granted a qualified immunity and are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Wilson v. Layne, 526 U.S. 603, 609 (1999) (quotation

omitted). "[W]e accept as true all well-pleaded facts, as distinguished from conclusory allegations, and view those facts in the light most favorable to the nonmoving party." Moya, 465 F.3d at 455 (quotation omitted). "The court must view all reasonable inferences in favor of the plaintiff, and the pleadings must be liberally construed." Ruiz v. McDonnell, 299 F.3d 1173, 1181 (10th Cir. 2002). The complaint must plead sufficient facts, taken as true, to provide "plausible grounds" that discovery will reveal evidence to support the plaintiff's allegations. Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007).

Once the qualified-immunity defense is asserted, "the plaintiff initially bears a heavy two-part burden. First, the plaintiff must demonstrate that the defendant's actions violated a constitutional or statutory right. Second, the plaintiff must show that the constitutional or statutory rights the defendant allegedly violated were clearly established at the time of the conduct at issue." Albright v. Rodriguez, 51 F.3d 1531, 1534 (10th Cir. 1995) (citations omitted). "A plaintiff can demonstrate that a constitutional right is clearly established by reference to cases from the Supreme Court, the Tenth Circuit, or the weight of authority from other circuits." Anderson v. Blake, 469 F.3d 910, 914 (10th Cir. 2006). "[T]here need not be precise factual correspondence between earlier cases and the case at hand, because general statements of the law are not inherently incapable of giving fair and clear warning." Id. at 913-14 (quotation and ellipsis omitted). The right must only be "sufficiently clear that a reasonable official

would understand that what he is doing violates that right." Id. at 913 (quotation omitted).

We proceed in two steps. First, we consider whether the conduct alleged constitutes a constitutional violation; only if we conclude that it does do we address whether the constitutional right violated was clearly established. Eidson, 515 F.3d at 1145. Deputy Mandelko argues that it was reasonable under the Fourth and Fourteenth Amendments to strip search Ms. Archuleta because Ms. Archuleta was charged with a violent crime ("domestic violence–harassment"), Aplt. Br. at 15-17, and because she could rely on the facially valid warrant for Ms. Archuleta's arrest, id. at 21-28. Tenth Circuit law is far more nuanced, however, and makes clear that the circumstances alleged in this case do not provide justification for a strip search. See Foote v. Spiegel, 118 F.3d 1416, 1425 (10th Cir. 1997); Cottrell v. Kaysville City, Utah, 994 F.2d 730, 734-35 (10th Cir. 1993); Hill v. Bogans, 735 F.2d 391, 394 (10th Cir. 1984).

The Fourth Amendment "requires a balancing of the need for the particular search against the invasion of personal rights that the search entails." Bell v. Wolfish, 441 U.S. 520, 559 (1979).[2] "Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for

---

[2] Bell concerned strip searches of "pretrial detainees—those persons who have been charged with a crime but who have not yet been tried on the charge"—and not individuals like Ms. Archuleta who were strip searched during the booking process. 441 U.S. at 523. We do not comment today on strip searches of detainees after they have been booked.

initiating it, and the place in which it is conducted." Id. With respect to the scope of the search, "[t]here can be no doubt that a strip search is an invasion of personal rights of the first magnitude." Chapman v. Nichols, 989 F.2d 393, 395 (10th Cir. 1993). In addition, there are no allegations in the complaint regarding the place in which Deputy Mandelko strip searched Ms. Archuleta. We therefore focus on the justification for the search and, because we hold Deputy Mandelko had no legally sufficient justification for the search based on Ms. Archuleta's allegations, decline to address whether the alleged manner in which the search was conducted supports Ms. Archuleta's claim.

We have articulated two primary concerns in determining whether a strip search is reasonable for the purposes of the Fourth Amendment: whether a detainee is to be placed in the general prison population and whether there is reasonable suspicion that the detainee has concealed weapons, drugs, or contraband. See Warner v. Grand County, 57 F.3d 962, 964 (10th Cir. 1995); Hill, 735 F.2d at 394. "Courts have consistently recognized a distinction between detainees awaiting bail and those entering the jail population when evaluating the necessity of a strip search under constitutional standards." Cottrell, 994 F.2d at 735. In this case, Ms. Archuleta alleges that she never intermingled with the general prison population but rather was "confined in a cell by herself for several hours" before her husband posted bail. Complaint ¶ 84. The obvious security concerns inherent in a situation where the detainee will be placed in the general

prison population are simply not apparent here.

Deputy Mandelko also could not have had reasonable suspicion that Ms. Archuleta had a weapon under these circumstances. Reasonable suspicion for a search is a minimum level of objective justification "based on the totality of the circumstances, taking into account an officer's reasonable inferences based on training, experience, and common sense." United States v. Rice, 483 F.3d 1079, 1083 (10th Cir. 2007). "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent [person] in the circumstances would be warranted in the belief that [her] safety or that of others was in danger." Id. at 1082-83 (quoting Terry v. Ohio, 392 U.S. 1, 27 (1968)). In this case, based upon the clothing Ms. Archuleta was wearing, the three "pat downs" she endured prior to being booked,[3] and the absence of any tattoos or moles indicating she was the culprit, Deputy Mandelko could not reasonably suspect the Ms. Archuleta had a weapon on her person. See Foote, 118 F.3d at

---

[3] Although there are no specific allegations in the complaint that Deputy Mandelko knew about these previous pat downs (or any of the circumstances surrounding Ms. Archuleta's arrest), drawing inferences in the light most favorable to Ms. Archuleta, see Ruiz, 299 F.3d at 1181, we can assume that a reasonable officer in Deputy Mandelko's position would know that Ms. Archuleta was frisked—at her arrest and in the waiting area—before being booked. "When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect [her] escape." Chimel v. California, 395 U.S. 752, 762-63 (1969). Such searches at an arrest are routine, and Deputy Mandelko, as a booking officer, had to have known that other officers would have frisked Ms. Archuleta in the waiting area as well.

- 10 -

1425.

In Foote, this court held that officers could not have had reasonable suspicion that a detainee had drugs to justify a strip search after a previous pat down of the detainee through her "light summer clothing" did not reveal anything. Id. at 1425. "Almost anything the strip search could have revealed would already have been discovered in the pat-down search." Id. The complaint alleges that Ms. Archuleta was wearing shorts and a sleeveless blouse when she was booked by Deputy Mandelko and that she had been patted down once by Officer Butler at her arrest and twice by unidentified officers in the waiting area at the detention facility. Complaint ¶ 64, 73. None of the frisks uncovered any weapons or contraband. Id. In addition, Deputy Mandelko was privy to the fact that Ms. Archuleta did not have Ms. Rivera's identifying marks. Id. ¶ 75. These facts indicate that a reasonable officer could not have had suspicion that Ms. Archuleta had a concealed weapon. See Rice, 483 F.3d at 1082-83; Foote, 118 F.3d at 1425.

Although the district court (in ruling on the due-process claim) and Deputy Mandelko are correct in stating that Deputy Mandelko was in no position to investigate whether Ms. Archuleta was guilty or innocent once she was brought to the Jefferson County Detention Facility under arrest, Aplt. App. at 172; Aplt. Br. at 22; see Baker v. McCollan, 443 U.S. 137, 145-46 (1979), this has little bearing on whether Deputy Mandelko was justified in conducting a strip search. The arrest warrant gave Deputy Mandelko cause for processing and detaining Ms.

- 11 -

Archuleta, but whether a strip search is permissible is a separate inquiry based on whether a detainee will be placed in the general prison population and whether the officer has reasonable suspicion that a detainee has hidden drugs, contraband, or weapons. See Foote, 118 F.3d at 1425; Cottrell, 994 F.2d at 734-35; Hill, 735 F.2d at 394. In this case, Ms. Archuleta was not placed in the general prison population and a reasonable officer could not have suspected Ms. Archuleta of harboring a weapon. The arrest warrant itself could not provide Deputy Mandelko with reasonable suspicion for a strip search.

The crime for which Ms. Archuleta was charged can provide some cause for suspicion, but it must be one "commonly associated by its very nature with the possession of weapons or contraband" to help provide reasonable suspicion for a strip search. Hill, 735 F.2d at 394 (quoting Logan v. Shealy, 660 F.2d 1007, 1013 (4th Cir. 1981)). The complaint alleges that the arrest warrant was for a municipal "harassment" violation, Complaint ¶ 46, but "DV–Harassment" appeared on the warrant, apparently in an effort to comply with Colo. Rev. Stat. § 18-6-801.6.[4] Deputy Mandelko insists that the "DV" notation indicates it is a violent crime sufficient to justify a strip search because "domestic violence" is defined in Colorado as "an act or threatened act of violence upon a person with whom the actor is or has been involved in an intimate relationship" or "any

---

[4] We need not reach the issue of whether the notation "DV-Harassment" is sufficient to comply with Colo. Rev. Stat § 18-6-801.6.

municipal ordinance violation against a person or against property, when used as a method of coercion, punishment, intimidation, or revenge directed against a person with whom the actor is or has been involved in an intimate relationship." Aplt. Reply Br. at 6 (quoting Colo. Rev. Stat. § 18-6-800.3). We disagree.

The actual harassment violation for which Ms. Archuleta was charged prohibits nothing more "violent" than when a person "strikes, shoves, kicks, or otherwise touches a person or subjects him to physical contact" "with intent to harass, annoy, or alarm another person." Lakewood, Co. Municipal Code § 9.50.040(A)(1). This is hardly an offense "commonly associated by its very nature with the possession of weapons," Hill, 735 F.2d at 394 (quoting Logan, 660 F.2d at 1013), and likely was classified as potential "domestic violence" because it was a "municipal ordinance violation" against an intimate under the Colorado statute rather than an actual violent crime, Colo. Rev. Stat. § 18-6-800.3. Thus, although the district court addressed several cases from other circuits ostensibly for the proposition that it is objectively reasonable to strip search someone charged with a crime of violence, Aplt. App. 175-76, and Deputy Mandelko contends that these cases support her search, Aplt. Br. at 14-19, we do not agree.[5] As the district court recognized, such a categorical rule is not the law

_____

[5] We require a more fact-intensive inquiry and have not adopted a per se rule for when a strip search is permissible. See, e.g., Foote, 118 F.3d at 1425. Thus, the published cases Deputy Mandelko discusses are distinguishable from this case because the detainee was placed or would come in contact with other inmates, see Hicks v. Moore, 422 F.3d 1246, 1251-52 (11th Cir. 2005); Thompson

- 13 -

of this circuit and, in any event, the "harassment" violation at issue here is not a "violent" crime. The crime charged simply was not an offense that would give a reasonable officer suspicion that Ms. Archuleta was "armed and dangerous." See Rice, 483 F.3d at 1082-83.

Ms. Archuleta thus has satisfied the first step of the two-step qualified-immunity inquiry by demonstrating that her constitutional rights were violated. We now consider whether those rights were clearly established at the time of the search. "On [January 24, 1991], it was clearly established in this circuit that a brief intermingling with the general jail population does not justify a strip search absent reasonable suspicion of drugs or contraband." Warner, 57 F.3d at 964

v. City of Los Angeles, 885 F.2d 1439, 1447 (9th Cir. 1989); Dobrowolskyj v. Jefferson County, Ky., 823 F.2d 955, 959 (6th Cir. 1987); Dufrin v. Spreen, 712 F.2d 1084, 1087 (6th Cir. 1983), because of the severity of the crime charged, see George v. City of Wichita, 348 F. Supp. 2d 1232, 1235, 1241 (D. Kan. 2004) (aggravated battery, which by definition could involve weapons), or because it is consistent with our law, see Masters v. Crouch, 872 F.2d 1248, 1255 (6th Cir. 1989) (holding that "strip search of a person arrested for a traffic violation or other minor offense not normally associated with violence and concerning whom there is no individualized reasonable suspicion that the arrestee is carrying or concealing a weapon or other contraband, is unreasonable" and "[t]he single fact that Mrs. Masters, for some reason, would come into contact with other prisoners was not sufficient justification for the search in this case").

Deputy Mandelko also relies upon Powell v. Barrett, 496 F.3d 1288 (11th Cir. 2007). That case held that where "the elements of the offense demonstrate that it is a crime of violence or a crime that involves weapons or drugs, the offense itself gives rise to reasonable suspicion to justify a strip search." Id. at 1311. As discussed above, we do not believe that the offense in this case, a violation of a municipal ordinance prohibiting harassment, is a crime of violence or can be said to involve weapons or drugs. In addition, this is not a case where the charge was the only information known to the officer and our precedent requires consideration of other known factors.

- 14 -

(citing <u>Hill</u>, 735 F.2d at 394). <u>Warner</u>'s citation to <u>Hill</u> further indicates it is also clearly established that an officer's reasonable suspicion that a detainee possesses <u>weapons</u> can justify a strip search as well, provided there is some intermingling with the general prison population. <u>See</u> <u>id.</u> By implication, then, a detainee who is not placed in the general prison population cannot be strip searched if the searching officer does not <u>at</u> <u>least</u> have reasonable suspicion that the detainee possesses concealed weapons, drugs, or contraband. As Ms. Archuleta alleges she <u>never</u> intermingled with the general prison population and we have held Deputy Mandelko <u>could</u> <u>not</u> have had reasonable suspicion that Ms. Archuleta possessed a weapon based upon the allegations in the complaint, we hold that the law in these circumstances was clearly established. <u>See</u> <u>Foote</u>, 118 F.3d at 1425; <u>Cottrell</u>, 994 F.2d at 734-35; <u>Hill</u>, 735 F.2d at 394. Deputy Mandelko violated this law by strip searching Ms. Archuleta and is not entitled to qualified immunity on these facts.

AFFIRMED.

07-1108 - *Archuleta v. Wagner*

**HARTZ**, Circuit Judge, concurring:

I agree that Deputy Mandelko is not entitled to qualified immunity at this stage of the proceeding. According to the complaint, Deputy Mandelko, after noting that Ms. Archuleta did not have tattoos or moles, told the receptionist that "this isn't her." Although Deputy Mandelko's subjective state of mind is irrelevant to whether she had grounds to strip search Ms. Archuleta, the quoted comment could imply that she had objective evidence showing that Ms. Archuleta was not the person named in the warrant. To strip search Ms. Archuleta in that circumstance, particularly given what she was wearing and that she had already been frisked, would be a clear violation of established Fourth Amendment principles. There may well be grounds for strip searching arrestees at a jail without individualized reasonable suspicion, but not in this circumstance.