**UNITED STATES COURT OF APPEALS**

**June 15, 2011**

**FOR THE TENTH CIRCUIT**

COLLIE M. TRANT,

      Plaintiff-Appellant,

v.

STATE OF OKLAHOMA; BOARD
OF MEDICOLEGAL
INVESTIGATIONS; OFFICE OF THE
CHIEF MEDICAL EXAMINER;
DEWAYNE ANDREWS, in his
individual and official capacities;
DOUGLAS STEWART, in his
individual and official capacities;
ROCKY MCELVANY, in his
individual and official capacities; C.
MICHAEL OGLE, in his individual
and official capacities; CHARLES
CURTIS, in his individual and official
capacities; KARLIS SLOKA, in his
individual and official capacities;
CHRIS FERGUSON, in his individual
and official capacities; SHANDA
MCKENNY, in her individual and
official capacities; CHEROKEE
BALLARD, in her individual and
official capacities; SANDRA
BALZER, in her individual and
official capacities; TOM JORDAN, in
his individual and official capacities,

      Defendants-Appellees.

No. 10-6247
(D.C. No. 5:10-CV-00555-C)
(W.D. Okla.)

## ORDER AND JUDGMENT[*]

Before **O'BRIEN**, **ANDERSON**, and **HOLMES**, Circuit Judges.

After his termination as Chief Medical Examiner for the State of Oklahoma (CME), plaintiff Collie M. Trant filed suit in state court against various entities and officers, claiming that his termination violated state and federal law. Citing the presence of federal claims brought against individual officers under 42 U.S.C. § 1983, defendants removed the action to federal court, *see* 28 U.S.C. § 1441, and then moved to dismiss those claims based on qualified immunity. The district court granted the motion and, declining to exercise supplemental jurisdiction under 28 U.S.C. 1367, remanded the remaining claims to state court. Mr. Trant appeals both aspects of the court's decision. For the reasons set forth below, we affirm in part, reverse in part, and remand for further proceedings.

## I. FACTUAL BACKGROUND

[*]     After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

The facts summarized here are taken, as they must be when qualified immunity is raised in connection with a motion to dismiss, from the four corners of the (amended) complaint. *Archuleta v. Wagner*, 523 F.3d 1278, 1281 (10th Cir. 2008). The Oklahoma Board of Medicolegal Investigations (Board), which controls and supervises the Office of the Chief Medical Examiner (OCME), appointed Dr. Trant as CME in May 2009. At that time, OCME was being investigated for sexual harassment and improper employee-overtime claims. Dr. Trant alleges he soon discovered that the person investigating the sexual harassment, Jill Kinney, was actually encouraging employees to advance unfounded harassment allegations and to make the suspect overtime claims. He directed OCME's executive administrator, defendant Cherokee Ballard, to relate the information to appropriate law enforcement officials. Later, Ms. Ballard allegedly told him she had been advised by defendant Sandra Balzer, the assistant Attorney General (AG) who served as legal advisor to OCME and the Board, that OCME should not put anything in writing about the potential misconduct.

In July 2009, the grand jury investigating OCME indicted former employee Kevin Rowland for sexual harassment and battery, triggering exchanges in the media between Mr. Rowland's attorney and the AG's office about the substance and propriety of the prosecution. In addition to the indictment, the grand jury issued an interim report generally critical of the OCME. Within days, reporters were questioning Dr. Trant about OCME's negative image. Dr. Trant stated that

-3-

he planned to counteract the image by publicly addressing various misstatements by the grand jury, politicians, and anyone else critical of OCME in recent years. Shortly thereafter, he met AG representatives, advising them that the grand jury's interim report contained gross errors. Dr. Trant claims he was told that the AG's office would "finish" OCME if he did not keep his mouth shut.

Mr. Rowland was acquitted in November 2009. In early December, an OCME employee gave Dr. Trant emails allegedly implicating Ms. Kinney in attempts to control the earlier grand jury testimony of OCME personnel and to solicit overtime claims against OCME on behalf of a private organization or law firm. The emails also purportedly showed that the persons accusing Mr. Rowland of sexual harassment had themselves participated in even worse misconduct. The employee who gave the emails to Dr. Trant complained that he had been subject to harassment by Ms. Kinney and the people who had made allegations against Mr. Rowland. Dr. Trant discussed the emails with Ms. Ballard, indicating it would take time to review the emails in detail but the information was going to make the AG look very bad with respect to the indictment of Mr. Rowland.

Around this time, Dr. Trant hired defendant Tom Jordan, previously the representative of the Oklahoma State Bureau of Investigation on the Board, to be OCME's Chief Administrative Officer, on the Board's recommendation. Upon learning that Mr. Jordan had met with subordinate employees without informing him, Dr. Trant instructed Mr. Jordan in future to advise him regarding the purpose

-4-

and nature of any such meetings. Mr. Jordan continued meeting with employees, particularly some of those implicated in the emails discussed above, without informing Dr. Trant. Near the end of January 2010, Mr. Jordan told Dr. Trant that, based on his meetings with the employees, he felt Dr. Trant was allowing the agency to self destruct. But Mr. Jordan refused to discuss these meetings with Dr. Trant, insisting he would not be a snitch. The two, however, agreed to meet the next day.

But that day, January 28, 2010, Dr. Trant was summoned to a meeting with several members of the Board by its chairman, defendant Dewayne Andrews. Dr. Trant alleges this meeting was in violation of the state's Open Meeting Act (OMA). When Dr. Trant arrived, he learned that Mr. Jordan was also present. Mr. Jordan complained about Dr. Trant based on what he had heard from OCME employees, but admitted he refused to identify them. Dr. Trant described their conversation of the day before, noting he had instructed Mr. Jordan to identify the employees he had met with and the purpose of the meetings. At some point, according to Dr. Trant, Mr. Jordan accused him of lying and lacking integrity. Board Chairman Andrews indicated that he felt the truth lay somewhere in the middle and adjourned the meeting.

The next day, Dr. Trant emailed Board Chairman Andrews, expressing concerns about the meeting. The email stated that he had exercised his proper statutory authority as OCME over Mr. Jordan. More significantly, it noted that he

-5-

had documentation indicating the sexual harassment claims relating to the failed prosecution of Mr. Rowland were faked by employees against whom he probably had sufficient evidence to bring criminal charges, and that the AG and grand jury had bungled the investigation by failing to look into Ms. Kinney and the employees making the accusations. He also stated that the AG had ignored his concerns regarding Ms. Kinney's investigation and had even threatened to "finish off" OCME after he complained of gross errors in the grand jury interim report about the agency. Board Chairman Andrews forwarded the email to other Board members for consideration at an emergency meeting on February 1, 2010–another meeting that Dr. Trant contends violated the state OMA.

At the meeting the Board went into executive session to discuss Dr. Trant's employment as CME. Dr. Trant was given twenty minutes to present information relevant to the matters raised in his email. He also threatened to hire a lawyer to report the wrongdoing associated with the grand jury investigation. Dr. Trant was thereafter excluded from the session, but he alleges on information and belief that Mr. Jordan repeated that he was inept, a liar, and lacked integrity and then joined Ms. Ballard in causing a groundless claim of sexual harassment to be presented to the Board. When the Board returned to open session, it voted to place Dr. Trant on administrative leave, taking his keys and pass card, thereby barring him from OCME facilities and cutting off access to his sources of information. Dr. Trant alleges that this action, taken on the advice of Assistant AG Balzer, exceeded the

Board's supervisory authority over a CME, which he contends the Board could only hire or fire and oversee through regulations.

The next day, the news media reported Dr. Trant's suspension, noting his discovery of evidence that led him to believe the sexual harassment allegations made against Mr. Rowland were false. This prompted the Board to call another meeting, schedule for February 5. In the meantime, the media reported that Scott Adams, the attorney who had represented Mr. Rowland, was now representing Dr. Trant, and quoted him as saying that Dr. Trant had complained to the AG about the problems with the investigation of Mr. Rowland. On February 4, a local newspaper reported that attorneys for Dr. Trant had said they plan to contact the FBI about irregularities discovered regarding the grand jury investigation, referring to hundreds of emails showing the grand jury was compromised. The next day, the media reported that Dr. Trant had been suspended because he had reported problems with the grand jury. That same day, February 5, the Board met and, again allegedly on the advice of Ms. Balzer, went into executive session and then voted to terminate Dr. Trant's employment. Dr. Trant contends this meeting violated the state OMA as well.

The following day, the media quoted Mr. Jordan as saying that he did not think Dr. Trant was competent to run the OCME, that he was not sure Dr. Trant was mentally stable, and that Dr. Trant had fabricated or embellished much of what he had said to the Board and the media. Dr. Trant claims these statements

-7-

were false and stigmatizing, particularly as to his professional standing. He also complains in the same vein about statements made to the media by Mr. Jordan and Ms. Ballard a month later, which allegedly suggested OCME property had been lost through mismanagement during the tenure of his administration.

## II. DISTRICT COURT PROCEEDINGS

Dr. Trant proceeded on an omnibus complaint asserting sixteen state and federal claims for relief against various defendants in different capacities. After removal, defendants moved to dismiss on various grounds, including qualified immunity as to the federal claims asserted against the individual defendants in their personal capacities. The latter claims alleged that the individual defendants (1) retaliated against Dr. Trant for engaging in protected speech, in violation of the First Amendment; (2) deprived Dr. Trant of a property interest in his employment as CME without providing adequate procedural protections, in violation of the Due Process Clause; and (3) deprived Dr. Trant of a liberty interest in his reputation by publishing stigmatizing statements in conjunction with his termination without providing him adequate procedures to clear his name, also in violation of the Due Process Clause. The district court limited its merits disposition to the dismissal of these federal claims, remanding the state claims for disposition in the Oklahoma courts.

As to the First Amendment claim, the district court concluded that all of the statements alleged by Dr. Trant to have prompted defendants' retaliatory actions

-8-

pertained to his official duties as CME.  A public employee's speech pursuant to his official duties is not constitutionally protected from evaluation and discipline by his government employer.  *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).  Accordingly, the district court held that Dr. Trant had not alleged a violation of First Amendment guarantees and, *a fortiori*, had not alleged a violation of clearly established First Amendment law.

As to the first due process claim, the district court rejected Dr. Trant's contention that state law, particularly the state OMA, created a property interest in his position as CME.  Rather, as CME, Dr. Trant was a mere at-will employee serving at the pleasure of the Board.  Concluding that Dr. Trant lacked a property interest sufficient to trigger constitutional protection, the district court held that he had not alleged a due process violation in this respect.  *See, e.g.*, *Darr v. Town of Telluride*, 495 F.3d 1243, 1251-53 (10th Cir. 2007) (rejecting fired deputy marshal's due process claim for lack of property interest in at-will employment).

As to the second due process claim, the district court noted that some of the allegedly stigmatizing statements were not published in the sense required to trigger protection, *see Sipes v. United States*, 744 F.2d 1418, 1421-22 (10th Cir. 1984) (holding no liberty interest implicated where reasons for termination were merely raised to and affirmed by administrative review board), and that those that were had not been adequately tied to either the basis for his termination as CME or the direct loss of other economic opportunities, *see Evers v. Regent of Univ. of*

*Colo.*, 509 F.3d 1304, 1310 (10th Cir. 2007) (noting liberty-interest claim may fail for these reasons). Accordingly, the district court held that Dr. Trant had not alleged a due process violation based on a liberty interest. It further held that the published statements were not, in any event, of a type that a reasonable official would have known implicated due process proscriptions, entitling defendants to qualified immunity even if a constitutional claim had been made out. *See generally Gomes v. Wood*, 451 F.3d 1122, 1135-36 (10th Cir. 2006).

Finally, the district court acknowledged that, having dismissed the federal claims, it had the discretionary authority to either retain and decide the state law claims or remand them to state court. Citing the governing statutory provisions and relevant case law, the district court elected to remand the state claims.

### III. APPELLATE REVIEW

"The correct standard for reviewing a motion to dismiss in a qualified immunity case is the same as for dismissals generally." *Archuleta*, 523 F.3d at 1281. Exercising de novo review, "we accept as true all well-pleaded facts, as distinguished from conclusory allegations, and view the facts in the light most favorable to the nonmoving party" to determine whether the complaint sets forth plausible grounds to believe the claims asserted will find evidentiary support. *Id.* at 1282-83 (quotation and alteration omitted). But we conduct this review in light of the unique nature of qualified immunity, which imposes a "heavy two-part burden" on a plaintiff: "First, the plaintiff must demonstrate that the defendant's

actions violated a constitutional or statutory right. Second, the plaintiff must show that the constitutional or statutory rights the defendant allegedly violated were clearly established at the time of the conduct at issue." *Id.* at 1283 (quotation omitted).

## A. First Amendment Claim

"[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 F.3d at 421. The Supreme Court has not set out "a comprehensive framework for defining the scope of an employee's duties" in this context. *Id.* at 424. But it has explained that "[t]he proper inquiry is a practical one," *id.,* and "the listing of a given task in an employee's job description is neither necessary nor sufficient to demonstrate that [it] is within the scope of the employees' professional duties," *id.* at 425. This court "take[s] a broad view" of what speech falls within official duties, asking generally if "it involves the type of activities that the employee was paid to do" *Chavez-Rodriguez v. City of Santa Fe*, 596 F.3d 708, 713 (10th Cir. 2010) (quotation omitted). Speech may pertain to official duties "even though it addresses an unusual aspect of the employee's job that is not part of his everyday functions," *id.* at 714 (quotation omitted), and "even if it deals with activities the employee is not expressly required to perform," *Thomas v. City of Blanchard*, 548 F.3d 1317, 1324 (10th Cir. 2008).

-11-

Whether speech relates to official duties is a legal inquiry for the court, not a factual question for the jury. *Chavez-Rodriguez*, 596 F.3d at 713.

Dr. Trant cites four communications that he contends involved protected speech outside of his official duties. The first is his email of January 29, 2010, to Board Chairman Dewayne Andrews relating his concern that OCME employees had given false or misleading accounts of sexual harassment by former co-worker Kevin Rowland, supporting his eventual indictment by the grand jury. We agree with the district court that informing the Board about such conduct by OCME personnel–as to both the accused former employee and the employees accusing him–was within the scope of Dr. Trant's official duties as CME. Speech about workplace matters communicated through proper chain of command is typically deemed within the scope of official duties. *See Rohrbourgh v. Univ. of Colo. Hosp. Auth.*, 596 F.3d 741, 747 (10th Cir. 2010); *cf. Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ.*, 595 F.3d 1126, 1135-36 (10th Cir. 2010) (noting report of wrongdoing may fall outside official duties if employee's job "did not relate to reporting wrongdoing" and "the employee went outside the chain of command when reporting the wrongdoing"). There could hardly be a clearer example of chain-of-command communication: the employees were Dr. Trant's subordinates and the Board his supervisor. *See* Okla. Stat. Ann. tit. 63, § 933 ("The [OCME] is . . . operated under the control and supervision of the Board. The [OCME] shall be directed by the [CME], [who] may employ such other staff members as the

-12-

Board may specify."); *id.* § 935 ("The [CME] shall be directly responsible to the Board . . . for the administration of the [OCME].").

Next, Dr. Trant notes that some of his comments to the Board included criticism of the grand jury investigation, and argues that this aspect of his speech removed it from the scope of his official duties. This argument artificially separates matters that are intrinsically linked. The AG was investigating OCME employees' accusations of sexual harassment by a fellow OCME employee, and the substance of Dr. Trant's objection regarding the investigation was that the accusing employees–his subordinates–had led the AG astray, resulting in the unjustified indictment of the accused OCME employee. That this objection also blamed the AG for being misled does not alter the fact that it related to incidents at OCME and accounts of those incidents given by OCME employees in the course of the ensuing investigation. Dr. Trant's discussion of such matters with the Board was within the scope of his official duties as director of OCME.

The other two communications cited by Dr. Trant, which the district court unfortunately did not address with specificity, raise very different considerations. Both involve statements he made about retaining counsel and reporting to outside authorities, such as the FBI, the wrongdoing he had discovered tainting the grand jury investigation. He made the first statement to the Board during the meeting that ended in his suspension, and the second (through counsel) to the media after the suspension and just before his termination. This court has repeatedly held

-13-

that reporting or threatening to report wrongdoing to outside authorities is not within the scope of official duties where the employee is not tasked to do so by his employer nor required to do so by independent legal obligation imposed as a function of his official position. *See Thomas*, 548 F.3d at 1324-26 (holding building inspector's threat to report illegal permit to state bureau of investigation was protected speech outside official duties); *Casey v. West Las Vegas Indep. Sch. Dist.*, 473 F.3d 1323, 1331-32 (10th Cir. 2007) (holding director of local Head Start program acted pursuant to official duties when, consistent with disclosure obligations attending her authority over the federally funded program, she informed regional Head Start office of school district's noncompliance with regulations governing program funds, but acted outside her official duties when reporting to state AG about school board's noncompliance with state law). There is nothing in the complaint to suggest that the CME's duties included reporting, to authorities such as the FBI, his suspicions of possible criminal wrongdoing and professional malfeasance in connection with the AG's investigation and resultant grand jury indictment of Mr. Rowland. Nor is there any indication of an independent legal obligation in this regard imposed on him specifically as a function of his position as CME. Under the cited case law, decided years before the events in this case, we must hold that the speech at issue triggered First Amendment protection and that defendants should have known it did.

Defendants have argued that, in the event we conclude any of Dr. Trant's speech fell outside his official duties, we should continue the First Amendment analysis beyond this first step at which the district court resolved the claim. They suggest we could affirm its dismissal later in the governing inquiry, specifically the third step, at which the court determines "whether the employee's interest in commenting on the issue outweighs the interest of the state as employer."[1] *Chavez-Rodriguez*, 596 F.3d at 713 (quotation omitted). We decline to do so, for good practical and prudential reasons. This step in the inquiry is not a simple matter. While it is framed as a "balancing test," it actually places a substantial threshold burden on the employer before balancing is even considered:

> [T]his Court has held that First Amendment rights are protected unless the employer shows that some restriction is necessary to prevent the disruption of official functions or to insure effective performance by the employee. In other words, unless the government employer can show that the termination was based on legitimate reasons grounded in the efficient conduct of political business, there is no need to proceed to balancing, and the First Amendment interest of the plaintiff prevails.

---

[1] The full "*Garcetti/Pickering* test" for resolving First Amendment claims of public employees consists of five steps: (1) whether the speech at issue was made pursuant to official duties; (2) whether the speech was on a matter of public concern; (3) whether the employer's interests in regulating the speech outweighs the employee's free speech interests; (4) whether the speech was a motivating factor in a detrimental employment action; and (5) whether the employer would have taken the same action if the speech had not occurred. *Dixon v. Kirkpatrick*, 553 F.3d 1294, 1301-02 (10th Cir. 2009).

*Dixon v. Kirkpatrick*, 553 F.3d 1294, 1304 (10th Cir. 2009) (quotations and citations omitted); *see also Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1207 (10th Cir. 2007) (stressing that "the *employer* bears the burden of justifying its regulation of the employer's speech"). As indicated by the repeated references in the quoted passage to the need for a "showing" of the employer's interest, this is a true burden of *demonstration*, not a mere matter of hypothetical articulation: "We have cautioned that the employer cannot rely on purely speculative allegations that certain statements caused or will cause disruption." *Dixon*, 552 F.3d at 304 (quotation omitted). The *Dixon* decision, with its lengthy discussion of this threshold matter, *see id.* at 1304-08, is a telling illustration of the potentially detailed considerations involved.

And that, of course, is only the prelude to the actual balancing required, where the court "ha[s] to weigh [the employee's] interest in making that speech, and the interest of her audience in hearing it, against the interests of her government employer." *Id.* at 1308. We have repeatedly noted that "'there is no easy formula for 'weighing' an employee's First Amendment speech against an employer's interest in an efficient and disciplined work environment.'" *Id.* (quoting *Brammer-Hoelter*, 492 F.3d at) (further quotation omitted).

There are certainly instances in which this court has disagreed with a district court's initial determination that a government employee's speech was unprotected but gone on to determine whether the disposition in favor of the

-16-

employer might still be affirmed at the balancing step of the inquiry. But, in light of the considerations noted above, it should not be surprising that such cases have involved the appeal from *summary judgment*–where an adequate factual record had been developed to actually "show," rather than merely speculate about, the employer's interest and to weigh it in an informed manner against the First Amendment interests involved. *See, e.g.*, *Thomas*, 548 F.3d at 1327-28; *Casey*, 473 F.3d at 1333-34. Here, not only do we lack a summary judgment record on which to rely for consideration of the government employer's interest and its comparative importance vis a vis the First Amendment interests alleged in the complaint, *we do not even have a responsive pleading from defendants*. Under the circumstances, remanding for further proceedings before the district court is in our view the most appropriate course.[2]

## B. Due Process Claim Based on Alleged Property Interest

"In the employment context, a property interest [for due process purposes] is a legitimate expectation in continued employment." *Hesse v. Town of Jackson*, 541 F.3d 1240, 1245 (10th Cir. 2008) (quotation omitted). "We determine whether such a property interest exists by looking at state law." *Id.* "State law

---

[2]     We likewise express no view as to Ms. Balzer's fall-back argument that she should not be held liable in connection with any of the Board's actions because she was not a member, despite her role as its legal advisor. We leave that point, with its potentially complicated legal and factual aspects, for the district court to address in the first instance as well.

sources for property interests can include statutes, municipal charters or ordinances, and express or implied contracts." *Schulz v. City of Longmont*, 465 F.3d 433, 444 (10th Cir. 2006) (quotation omitted). A property interest may be created based on "tenure, a contract for a fixed term, an implied promise of continued employment, or if state law allows dismissal only for cause or its equivalent." *Darr*, 495 F.3d at 1251. But state law providing for mere at-will employment will not give rise to a property interest. *Id.* at 1252.

Oklahoma law divides public employees into two categories–"classified" and "unclassified"–differentiated specifically with regard to their at-will status:

> [A] classified employee[] is not an employee-at-will. Under the Oklahoma Personnel Act, public employees are designated as being in either "classified" or "unclassified" service. Employees in classified service are under the jurisdiction of the Oklahoma Merit System of Personnel Administration, and are protected by detailed rules and procedures concerning all aspects of the employment relationship, including the right to appeal from . . . suspensions, and involuntary discharge without just cause. These employment rights are not afforded to employees in the unclassified service. Unclassified employees serve at the pleasure of their employers and may be discharged at any time, "with or without cause." They are considered at-will employees.

*McCrady v. Okla. Dep't of Pub. Safety*, 122 P.3d 473, 475 (Okla. 2005) (citations omitted).[3] In terms directly relevant to the due process inquiry, an unclassified

---

[3] There is Tenth Circuit case law broadly stating that, absent specific contractual arrangements to the contrary, "public employees are employed at will." *Bunger v. Univ. of Okla. Bd. of Regents*, 95 F.3d 987, 990 (10th Cir. 1996). Such statements must be qualified in light of the authoritative construction of

(continued...)

position "shall not convey any right or expectation of continued employment."

Okla. Stat. Ann. tit. 74, § 840-5.1A(A). Positions designated as unclassified

include "heads of agencies." *Id.* § 840-5.5(A), (A)(2). As an office of the State

of Oklahoma, the OCME is an "agency," *id.* § 840-1.3(1), and the CME heads the

OCME, *see* Okla. Stat. Ann. tit. 63, §§ 933 and 935. The CME is clearly an

unclassified at-will position–a point corroborated by express statutory recognition

that the CME "serve[s] at the pleasure of the Board." *Id.* § 934.

    The straightforward conclusion from the foregoing is that Dr. Trant was a

mere at-will employee with no property interest in his position as CME sufficient

to trigger due process protections.[4] He attempts to avoid this conclusion by

---

[3](...continued)
state law by the Oklahoma Supreme Court.

[4]    In one variant of his argument, Dr. Trant insists that even if he could be *terminated* without due process, the Board lacked authority to *suspend* him for the few days before he was fired and this alleged lack of authority translates into a distinct property right violated by the Board without due process. There are any number of deficiencies with this argument. As a general matter, the notion that an employee may be summarily fired yet has a right to due process before being suspended defies common sense, and Dr. Trant cites no constitutional authority recognizing such a facially incoherent application of due process guarantees. In any event, the underlying premise for this position–that the CME's "serv[ice] at the pleasure of the Board" does not afford the Board the authority to suspend a CME–is specious. No case has been brought to our attention suggesting that the discretionary authority implied by such unqualified language does not include the power to suspend service as well as terminate it. Instead, Dr. Trant takes an entirely different tack, seizing on a reference in § 933 to "rules as the Board may prescribe" to argue that the Board may take such actions as suspending the CME only after establishing parameters for the action through rule-making. But the reference relates specifically to the Board's prescription of rules governing the

(continued...)

arguing that the procedural requirements of the state Open Meeting Act (OMA), Okla. Stat. Ann. tit 25, §§ 301-314, gave him a protected interest sufficient to support a due process claim to remedy the Board's alleged non-compliance with the OMA in connection with his suspension and termination. The district court rejected this argument on the basis that the OMA was intended solely for the public's benefit and not to provide enforceable rights for state employees adversely affected by decisions taken in violation of the OMA. While we believe Dr. Trant's reliance on the OMA is misplaced, we do not adopt the district court's reasoning in this respect, as Oklahoma case law indicates that public employees may indeed challenge decisions affecting their employment for lack of compliance with OMA procedures. *See Oldham v. Drummond Bd. of Educ.*, 542 P.2d 1309, 1310-11 (Okla. 1975) (affirming judgment declaring teacher's termination invalid due to school board's noncompliance with OMA); *see also Graybill v. Okla. State Bd. of Educ.*, 585 P.2d 1358, 1359-60 (Okla. 1978) (considering teacher's OMA challenge to non-renewal of contract but rejecting it on the merits because school board had complied with OMA).

The flaw in Dr. Trant's position is, rather, that the OMA imposed only procedural, not substantive, constraints on the Board. Nothing in the OMA limits the grounds on which the Board could act, such as a requirement for "just cause"

---

[4](...continued)
CME's delegation of his authority to deputies and nothing else.

or the like.  Thus, he "attempts to construct a property interest out of procedural timber, an undertaking which the Supreme Court warned against in *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, [541] . . . (1985)."  *Bunger v. Univ. of Okla. Bd of Regents*, 95 F.3d 987, 990-91 (10th Cir. 1996) ("'Property' cannot be defined by the procedures provided for its deprivation" (quotation omitted)); *see Ripley v. Wyo. Med. Ctr., Inc.*, 559 F.3d 1119, 1125 (10th Cir. 2009) ("'an entitlement to nothing but procedure' cannot serve as the basis for a property right protected by the Due Process Clause" (quoting *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 764 (2005)).  Under well established principles, Dr. Trant's property-interest claim must fail.

## C.  Due Process Claim Based on Alleged Liberty Interest

Dr. Trant has limited his appellate argument on this issue to the statement Mr. Jordan made to the press the day after Dr. Trant's termination.  The media allegedly quoted Mr. Jordan saying:  "I don't think the man's competent to run the agency.  I'm not sure he's mentally stable.  And he has fabricated . . . or embellished many of the statements he has made both . . . in executive sessions of the board meetings and to the media."  App. Vol. I at 26.  Dr. Trant further alleged that, although Mr. Jordan was not a Board member, no "representative of the Board disputed the accusations made publicly by [him]."  *Id.* at 24.

A liberty interest claim against a government employer based on damaging defamatory statements has four elements:

-21-

> First, . . . the statements must impugn the good name, reputation, honor, or integrity of the employee. Second, the statements must be false. Third, the statements must occur in the course of terminating that employee or must foreclose other employment opportunities.[5] And fourth, the statements must be published.

*Evers*, 509 F.3d at 1308 (quotation omitted). "These elements are not disjunctive, all must be satisfied to demonstrate deprivation of the liberty interest." *Id.* (quotation omitted).

The district court held that Dr. Trant's claim failed on the third element because (1) "Defendant Jordan's statement . . . was made after [Dr. Trant] was terminated and was not the basis for his termination, so [Dr. Trant] must show a tangible harm foreclosing future opportunities," and (2) Dr. Trant's conclusory allegations "that he 'suffered economic loss' and that 'numerous potential clients . . . failed . . . to hire [him]' . . . are insufficient to satisfy the level of tangible harm required for a liberty interest due process claim." App. Vol. I at 78-79. Dr. Trant challenges only the first conclusion, arguing that to be actionable the stigmatizing statements need not be made simultaneously with the employee's termination nor relate directly to the reasons for termination, so long as they are intertwined with the termination. He is correct on the first point, as "[r]oughly

---

[5]    There is some uncertainty in our case law as to whether the two aspects of the third element should be considered conjunctive rather than disjunctive. *See Darr*, 495 F.3d at 1255 & n.4 (discussing conjunctive formulation suggested by *Renaud v Wyo. Dep't of Family Servs.*, 203 F.3d 723 728 n.1 (10th Cir. 2000)). We do not pursue the point, as the district court gave Dr. Trant the benefit of the disjunctive test and the difference is not material to our disposition.

contemporaneous" statements can suffice. *Renaud v Wyo. Dep't of Family Servs.*, 203 F.3d 723, 727 (10th Cir. 2000). The second point is less clear-cut, however. We held in *Renaud* that even defamation contemporaneous with termination will not support a liberty interest claim if it "ha[s] nothing to do with the reasons for termination." *Id.* And we enforced that rule fairly strictly in holding that an employee fired for violating a substance abuse policy could not base a claim on false statements "that he had checked out of rehabilitation and was dangerous." *Id.* at 726. We need not undertake here the task of specifying in exacting fashion how closely a stigmatizing statement must relate to the reasons for termination, as additional considerations undercut Dr. Trant's claim.

We take a "common-sense approach [to the liberty-interest inquiry,] examining the nature of the alleged defamation, as well as its timing, to determine whether it occurred in the course of the termination." *Id.* at 727. Here, the Board did not publicly disclose the reasons for Dr. Trant's termination. And Dr. Trant's allegations do not show that Mr. Jordan–who was not a Board member but merely a subordinate OCME employee–was authorized to speak for the Board or that the Board subsequently adopted his derogatory comments. Moreover, the comments themselves do not suggest that Mr. Jordan was speaking on behalf of the Board or even independently revealing its confidential reasons for terminating Dr. Trant. On the contrary, Mr. Jordan's repeated self-attributions ("*I don't think* the man's competent to run the agency. *I'm not sure* he's mentally stable.") indicate that he

was merely stating his own criticisms of his erstwhile boss at the OCME. While such personal statements might perhaps support a state tort claim against Mr. Jordan, they are not in our view properly deemed statements *made in the course of Dr. Trant's termination* by the Board so as to implicate a liberty interest sufficient to support a due process claim.

## IV. CONCLUSION

In sum, we affirm the dismissal of Dr. Trant's due process claims, but hold that the district court erred in dismissing his First Amendment claim insofar as it rests on alleged retaliation for his threat to go to outside authorities with evidence of wrongdoing in connection with the grand jury investigation of Mr. Rowland, as such action would not fall within his official duties as CME. Because the latter holding reinstates one of the federal claims underwriting removal of the action to federal court, the district court's decision to remand the case to state court has lost its legal premise and must be reversed as well.

The judgment of the district court is AFFIRMED IN PART, REVERSED IN PART, and the cause is REMANDED for further proceedings consistent with this order and judgment.

Entered for the Court


Jerome A. Holmes
Circuit Judge